Anthony M. CLAUDIO, Plaintiff,

v.

**MATTITUCK–CUTCHOGUE UNION
FREE SCHOOL DISTRICT,**
Defendant.

No. 09–CV–5251 (JFB)(AKT).

United States District Court,
E.D. New York.

July 24, 2013.

Frank J. Blangiardo, Frank J. Blangiardo, Esq., Cutchogue, NY, for Plaintiff.

Jeltje DeJong, Joshua S. Shteierman, and Kelly E. Wright, Devitt Spellman Barrett, LLP, Smithtown, NY, for Defendant.

## MEMORANDUM AND ORDER

JOSEPH F. BIANCO, District Judge:

Plaintiff Anthony M. Claudio ("plaintiff" or "Claudio") filed the instant action against defendant Mattituck–Cutchogue Union Free School District ("defendant" or "District"), alleging gender and age discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, the Americans with Disabilities Act, and the Age Discrimination in Employment Act ("ADEA"), as well as under 42 U.S.C. §§ 1981 and 1983, the Fourteenth Amendment to the Constitution, and New York laws against discrimination.

Plaintiff withdrew his federal claim under the Americans with Disabilities Act and his claims under New York State law. On September 29, 2011, the Court denied orally on the record defendant's motion for summary judgment on both plaintiff's ADEA claim and gender discrimination claim under Title VII; the Court granted the motion as to all other federal claims. The Court stated that a written opinion would follow, and the Court's analysis is contained in this Memorandum and Order.

The remaining claims—namely, gender discrimination under Title VII and age discrimination under the ADEA—were tried before a jury, commencing on October 9, 2012. On October 22, 2012, the jury returned a unanimous verdict for plaintiff on his age discrimination claim, finding that the District discriminated against plaintiff based upon his age in connection with its termination of his employment as a special education teacher. Regarding his gender discrimination claim, the jury returned a verdict in defendant's favor. With respect to damages, the jury awarded $70,000.00 as back pay damages, and one dollar in nominal damages, against the District.[1]

Presently before the Court are defendant's post-trial motions, as well as plaintiff's cross-motion for reinstatement of a position or, alternatively, for front pay and lost benefits. The cross-motion also includes a request for attorneys' fees and costs. Defendant's post-trial motions consist of: (1) a motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), in which defendant argues that plaintiff failed to present legally sufficient evidence showing that defendant's employment decision was pretextual, *i.e.*, motivated by discriminatory animus, and (2) a motion for a new trial under Federal Rule of Civil Procedure 59 because (a) the verdict was against the weight of the evidence, and (b) plaintiff's counsel's improper conduct pervaded trial to such an extent that it improperly influenced the jury's verdict.

For the reasons that follow, with the exception of vacating the nominal damage award, defendant's Rule 50 and Rule 59 motions are denied in their entirety. Specifically, there was sufficient evidence from which a rational jury—if it credited plaintiff's evidence—could have found that plaintiff was terminated as a special education teacher on account of his age. As discussed more fully *infra*, there were several categories of evidence introduced at trial upon which the jury could have rationally based such a verdict.

First, plaintiff was age 47 at the time of his termination; he was replaced by an

---

**1.** Following the verdict, it was agreed by counsel and the Court at sidebar that, given the award of compensatory damages, no award of nominal damages should have been made. However, rather than send the jury back into the jury room to correct that inconsistency, it was agreed by the parties that the Court would simply strike the award of nominal damages of one dollar. (Tr. 925:3–11.)

individual who was 25 years old. Second, there were several statements attributed to Superintendent James McKenna that, if credited and reasonably construed in plaintiff's favor, could support an age discrimination claim. These include the following: (1) plaintiff's wife testified that, after her husband was denied tenure, she inquired of Superintendent McKenna why this had occurred, and he responded, before walking away, that he "can't teach an old dog new tricks" (Tr. 543:19–544:8); (2) a board member, Janique Nine, testified that prior to the April 16, 2009 board Meeting, in which the decision to deny plaintiff tenure was made, Superintendent McKenna commented to Nine that they "were going in a new direction with special ed and that Mr. Claudio was, he had an old school style" (Tr. 523:12–19); (3) Barbara Smith, a teacher at Cutchogue East Elementary School and plaintiff's sister-in-law, testified that she saw Superintendent McKenna hand a pile of resumes, consisting of individuals to interview, to the employment committee, and this pile largely contained young, female applicants in it; and (4) Smith also testified that, on one occasion, Superintendent McKenna had expressed to her that he wanted to hire young people whom he could mold. (Tr. 201:23–203:7.) Third, there was evidence that Superintendent McKenna initially agreed that plaintiff should receive tenure, but that he then decided not to grant plaintiff tenure, electing instead to terminate plaintiff's employment. Fourth, not only did plaintiff contest at trial the validity of the performance reasons offered in support of Superintendent McKenna's termination decision, but plaintiff also introduced testimony from several witnesses, including two school board members, who believed that, based upon plaintiff's performance, plaintiff should have received tenure. Additionally, school principal Shawn Petretti testified that, at least ini-

tially, he supported the position that plaintiff should receive tenure, and also, told plaintiff that he believed plaintiff would receive tenure. Fifth, plaintiff presented the testimony of other witnesses—including the school psychologist, the school guidance counselor coordinator, and a teaching assistant in the special education department—that undermined the validity of one or more of the reasons articulated by Superintendent McKenna for plaintiff's termination. Lastly, Petretti testified that, in McKenna's eight years as Superintendent, Petretti was not aware of any male over 40 hired by McKenna who had received tenure. In short, when all of the evidence is viewed in the light most favorable to the nonmoving party, there was certainly more than sufficient evidence to permit a rational jury to find in plaintiff's favor on the age discrimination claim. Thus, there is no basis for relief under Rule 50.

With respect to the Rule 59 motion, although plaintiff's counsel engaged in courtroom antics and theatrics that were unprofessional and inappropriate, the Court has no reason to believe that counsel's conduct improperly prompted the jury to return a verdict in plaintiff's favor. There are several reasons for this conclusion. First, at times counsel's conduct was so clearly inappropriate and unprofessional that, if a rational juror were to have improperly considered such conduct in reaching a verdict, he or she would have been less likely to return a verdict for the plaintiff, not more likely. Second, counsel's antics primarily related to trivial and/or collateral issues in the case that could not possibly have influenced the jury's verdict. Third, when the Court warned counsel about certain behavior, counsel generally avoided repeating the same conduct. Fourth, the Court, sometimes *sua sponte,* gave extremely strong and specific instruc-

tions to the jury during the course of the trial to alleviate any potential prejudice to defendant from plaintiff's counsel's conduct; defendant never requested any additional relief during the trial (such as additional instructions, a mistrial, or other sanction). Finally, the fact that the jury found no liability on the gender discrimination claim illustrates that the jury was not blindly influenced by counsel's conduct when returning a verdict favorable to plaintiff. In sum, having presided over the entire trial (and having observed the evidence, the jury, and the conduct of plaintiff's counsel), the Court concludes that plaintiff's counsel's conduct did not unfairly influence the jury's verdict in any way. In fact, the Court believes that plaintiff did not prevail *because* of counsel's inappropriate conduct, but rather, prevailed *despite* such conduct. Accordingly, the Rule 59 motion is denied.

Finally, the Court requires supplemental briefing on the issues of reinstatement, front pay, and lost benefits before a decision may be made on such issues. Similarly, plaintiff's counsel shall submit supplemental documentation supporting the attorneys' fees and costs requested.

### I. Procedural Background [2]

Plaintiff filed the complaint in this action on December 1, 2009. On February 4, 2011, defendant requested a pre-motion conference in anticipation of filing a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. The parties engaged in motion practice, and oral argument was heard on September 29, 2011. At the conclusion of oral argument, the Court granted in part and denied in part defendant's motion for summary judgment for the reasons set forth orally on the record; it also noted that a written memo-

randum and order would follow. In particular, the Court orally denied on the record defendant's motion for summary judgment on the ADEA claim and the gender discrimination claim under Title VII, but it granted the motion as to all other claims. The remaining claims were tried before a jury. Trial subsequently was held, beginning on October 9, 2012, and concluding on October 22, 2012. On October 22, 2012, the jury returned a unanimous verdict for plaintiff on his age discrimination claim, finding that the District had discriminated against plaintiff based upon his age in connection with its termination of his employment as a special education teacher. In regards to plaintiff's gender discrimination claim, the jury returned a verdict in defendant's favor. With respect to damages, the jury awarded $70,000.00 as back pay damages, and one dollar in nominal damages, against the District.

Following the jury's verdict, the Court set a briefing schedule for the parties' currently pending Rules 50(b) and 59 motions. Plaintiff also filed a cross-motion for reinstatement of a position or, alternatively, for front pay and lost benefits. The cross-motion also included a request for attorneys' fees and costs. These motions were fully submitted on January 31, 2013, and oral argument took place on February 18, 2013. Defendant's counsel also submitted a letter following oral argument with respect to the damages issues that were raised at oral argument. The Court has considered all of the parties' submissions.

### II. Discussion

#### A. Rule 56 Summary Judgment Motion

■ On September 29, 2011, the Court denied orally on the record defendant's

---

**2.** For ease of reference, the Court has not utilized a general factual background section, but rather analyzes the relevant facts for each

motion within the discussion section for that particular motion.

motion for summary judgment on both plaintiff's ADEA claim and gender discrimination claim under Title VII; the Court granted the motion as to the other federal claims that had not been withdrawn—namely, the Section 1983 claim for violation of plaintiff's procedural due process rights and the retaliation claim under Title VII. The Court noted that a more detailed analysis would follow in a written opinion. That more detailed analysis is contained below.[3]

### 1. Standard of Review

The standard for summary judgment is well settled. Pursuant to Federal Rule of Civil Procedure 56(a), a court may only grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The movant "bears the burden of showing that he or she is entitled to summary judgment." *Huminski v. Corsones,* 396 F.3d 53, 69 (2d Cir.2005). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R.Civ.P. 56(c)(1). The court " 'is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments.' " *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir.2004) (quoting *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir.1996)); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248,

---

**3.** The Court also denied plaintiff's cross-motion for an adverse inference instruction based upon a purported spoliation of evidence—the alleged failure to retain the video for the April 16, 2009 public school board meeting. A spoliation inference is available if: (1) relevant evidence is destroyed, (2) with culpability, (3) when the defendant was under a duty to preserve the evidence. *See Byrnie v. Cromwell, Bd. of Educ.,* 243 F.3d 93, 107–09 (2d Cir.2001) (citing *Kronisch v. United States,* 150 F.3d 112, 128 (2d Cir. 1998)). Ordinary negligence is sufficient for a finding of a culpable state of mind. *Zubulake v. UBS Warburg LLC,* 220 F.R.D. 212, 220 (S.D.N.Y.2003). "[T]he party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed or unavailable evidence would have been of the nature alleged by the party affected by its destruction." *Scalera v. Electrograph Sys., Inc.,* 262 F.R.D. 162, 178 (E.D.N.Y.2009) (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.,* 306 F.3d 99, 108–09 (2d Cir.2002)). Relevance may be inferred from a sufficiently culpable state of mind, such as where documents were destroyed in bad faith or under "some circumstances" where defendants were grossly negligent in destroying documents. *See Residential Funding,* 306 F.3d at 109. Relevance may also be established through extrinsic evidence tending to show that the missing evidence would have been relevant and favorable to the moving party. *See id.; Scalera,* 262 F.R.D. at 178. Applying that standard, the Court determined that plaintiff had not demonstrated that defendant acted in bad faith or with the requisite state of mind to sustain a spoliation charge, nor did plaintiff demonstrate that the evidence would have been favorable to him. In any event, there was no prejudice because the board minutes of the meeting were available and there was no dispute about what had transpired at the meeting (which plaintiff's counsel attended). However, the Court made clear in its oral ruling that plaintiff's counsel was free to make an adverse inference argument to the jury regarding the absence of a video.

106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party " 'must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.'* " *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir.2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)) (alteration in original). As the Supreme Court stated in *Anderson,* "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247, 106 S.Ct. 2505. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth " 'concrete particulars' " showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978)). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.,* 77 F.3d 603, 615 (2d Cir.1996) (quoting *Research Automation Corp.,* 585 F.2d at 33) (internal quotation mark omitted).

### 2. Section 1983 Claim

In support of its motion for summary judgment, defendant argued the following: (1) plaintiff did not have a property interest in continued employment as a *probationary* employee, and therefore could not assert a due process claim on that basis; and (2) because of the availability of an Article 78 proceeding, a procedural due process claim fails as a matter of law. As set forth below, the Court agreed with defendant that the due process claim could not prevail as a matter of law based upon the undisputed facts and, therefore, concluded that summary judgment on that claim was warranted.

■ In *Board of Regents v. Roth,* the Supreme Court held that procedural due process requirements "apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and *property.*" 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (emphasis added). Property interests are determined and created by state laws that "secure certain benefits and that support claims of entitlement to those benefits." *Id.* at 577, 92 S.Ct. 2701. Property interests arise in the employment context "only where the state is barred, whether by statute or contract, from terminating (or not renewing) the employment relationship *without cause.*" *S & D Maint. Co. v. Goldin,* 844 F.2d 962, 967 (2d Cir.1988). Thus, in order to establish a federal procedural due process claim, the plaintiff must first establish that he possesses a property right in his continued employment. *See Bishop v. Wood,* 426 U.S. 341, 345–47, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976) (holding that defendant did not deprive plaintiff of a property interest in continued employment).

■ It is well settled in New York that a probationary employee, unlike a permanent employee, has no property rights in his position and may be lawfully discharged without a hearing and without any stated specific reason. *See McKenzie v. Jackson,* 152 A.D.2d 1, 8, 547 N.Y.S.2d 120

(2d Dep't 1989), *aff'd* 75 N.Y.2d 995, 557 N.Y.S.2d 265, 556 N.E.2d 1072 (1990); *see also York v. McGuire*, 63 N.Y.2d 760, 761, 480 N.Y.S.2d 320, 469 N.E.2d 838 (1984); *Connor v. Bd. of Educ. of Bayport–Blue Point Union Free Sch. Dist.*, 184 A.D.2d 698, 698, 587 N.Y.S.2d 181 (2d Dep't 1992). Therefore, many federal and state courts in this Circuit have found that probationary employees are not subject to the same due process protection as permanent employees. *See, e.g., Ryan v. Carroll*, 67 F.Supp.2d 356, 361 (S.D.N.Y.1999) (finding police officer to be a probationary employee not entitled to a due process hearing); *Flood v. Cnty. of Suffolk*, 820 F.Supp. 709, 712–14 (E.D.N.Y.1993) (finding that police officer possessed no property right in her probationary position and that her resulting discharge presents no federal constitutional problems); *York*, 63 N.Y.2d at 761, 480 N.Y.S.2d 320, 469 N.E.2d 838 (upholding discharge of probationary police officer without a hearing).

Plaintiff did not provide any evidence or cite to any state law or ordinance indicating that he is entitled to continued employment as a probationary employee. "A property interest in employment can, of course, be created by ordinance, or by an implied contract. In either case, however, the sufficiency of the claim of entitlement must be decided by reference to state law." *Bishop*, 426 U.S. at 344, 96 S.Ct. 2074 (footnotes omitted) (refusing to find property interest where one is not created by state ordinance). As discussed above, New York law clearly does not provide a property right for probationary employees. Accordingly, in denying summary judgment, the Court determined that plaintiff's claim of violation of due process resulting from his termination, based upon a purported property interest in his continued employment, could not survive summary judgment.[4]

The Court also concluded that, even if the Court assumed *arguendo* that plaintiff could demonstrate the deprivation of his liberty interest, the plaintiff must also demonstrate that his liberty was deprived without due process of law. The Court found that plaintiff could not satisfy this component in this case as a matter of law because of the availability of an Article 78 proceeding.

■ New York law, pursuant to CPLR Article 78, provides a dismissed municipal employee with an avenue for challenging his termination as arbitrary and capricious and contrary to law. It is well settled that the availability of an Article 78 proceeding bars a municipal employee from maintaining a Section 1983 procedural due process claim. The availability of an adequate post-deprivation procedure for reviewing the propriety of the dismissal means that there has been no constitutional violation. *See Hudson v. Palmer*, 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); *see also Hellenic Am. Neighborhood Action Comm. v. City of N.Y.*, 101 F.3d 877, 882 (2d Cir.1996) ("*HANAC*") ("Even if HA-

---

4. The Second Circuit has "recognized that a probationary employee can 'invoke the protections of the Due Process Clause' where that employee has suffered a loss of reputation 'coupled with the deprivation of a more tangible interest, such as government employment.'" *Segal v. City of N.Y.*, 459 F.3d 207, 212 (2d Cir.2006) (quoting *Patterson v. City of Utica*, 370 F.3d 322, 330 (2d Cir.2004)). This type of action, which is referred to as a "stigma-plus" claim, has been defined by the Second Circuit as "a claim brought for injury to one's reputation (the stigma) coupled with the deprivation of some 'tangible interest' ... or property right (the plus), without adequate process." *Id.* at 209 n. 1 (quoting *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir.2003)) (quotations omitted). However, plaintiff never asserted such a claim, nor did he submit sufficient evidence to allow such a claim to survive summary judgment (even if it was asserted).

NAC has a protectable property and liberty interest—on which we express no opinion—HANAC, because of the availability of an Article 78 proceeding, was not deprived of such property or liberty without due process of law."); *accord Campo v. N.Y.C. Emps. Ret. Sys.*, 843 F.2d 96, 101–03 (2d Cir.1988). Article 78 proceedings have been held to be adequate post-deprivation procedures and they frequently function as name-clearing hearings. *See, e.g., Blum v. Quinones*, 139 A.D.2d 509, 510, 526 N.Y.S.2d 611 (2d Dep't 1988); *Merhige v. Copiague Sch. Dist.*, 76 A.D.2d 926, 927, 429 N.Y.S.2d 456 (2d Dep't 1980).

■ In the instant case, plaintiff never brought an Article 78 proceeding in state court and did not set forth any basis for concluding that this available state remedy was inadequate. Where, as here, the plaintiff had available adequate process, he cannot be said to have been "deprived of due process simply because [he] failed to avail [himself] of the opportunity." *HANAC*, 101 F.3d at 881 (citation and internal quotation marks omitted). The Article 78 proceeding was available to plaintiff, and as discussed above, that availability means there is no constitutional violation. Accordingly, the Court concluded, even assuming *arguendo* that there was a property interest in this case, that the due process claim was not cognizable in this case because of an adequate remedy in the form of an Article 78 proceeding for any such deprivation.

In sum, for the reasons set forth above and on the record previously, summary judgment on the Section 1983 due process claim was warranted in defendant's favor.

### 3. Retaliation Claim

Plaintiff also appeared to have asserted a retaliation claim under Title VII. As set forth below, because there was no evidence in the record of any protected activity by plaintiff, the Court concluded that the retaliation claim could not survive summary judgment.

■ Title VII prohibits an employer from firing an employee in retaliation for having made a charge of discrimination. 42 U.S.C. § 2000e–3(a); *see also* N.Y. Exec. Law § 296(1)(e); N.Y.C. Admin. Code § 8–107(7). To establish a prima facie case of retaliation, a plaintiff must show that (1) he engaged in a protected activity; (2) defendant was aware of that activity; (3) he suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 66 (2d Cir.1998); *see also Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir.2003).

■ Retaliation claims are similarly governed by the burden-shifting framework set out by the Supreme Court in *McDonnell Douglas*. *Terry*, 336 F.3d at 141. Although the burden that a plaintiff must meet at the prima facie stage is minimal, the plaintiff must proffer at least competent evidence of circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive. *See Cronin v. Aetna Life Ins.*, 46 F.3d 196, 204 (2d Cir.1995). As set forth below, the Court found that plaintiff made out the prima facie case required by *McDonnell Douglas*.

■ The term "protected activity" refers to action taken to protest or oppose statutorily prohibited discrimination. *See* 42 U.S.C. § 2000e–3(a); *see also Wimmer v. Suffolk Cnty. Police Dep't*, 176 F.3d 125, 134–35 (2d Cir.1999). Informal as well as formal complaints constitute protected activity. *See Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990). Moreover, to establish that his activity is protected, a plaintiff "need not prove the

merit of his underlying discrimination complaint, but only that he was acting under a good faith, reasonable belief that a violation existed." *Id.; see also Grant v. Hazelett Strip–Casting Corp.*, 880 F.2d 1564, 1569 (2d Cir.1989).

■ Defendant argued that plaintiff was not engaged in protected activity within the meaning of Title VII. The Court agreed. Plaintiff pointed to no evidence of any protected activity prior to his termination. In his opposition papers, plaintiff asserted that the 2009 termination was retaliation against plaintiff by McKenna for plaintiff having applied to a vacant social studies teaching position in 2003. (*See* Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. & Supp. for Pl.'s Cross– Mot. ("Pl.'s Summ. J. Mem.") at 14; *see also* Compl. ¶ 19 (describing alleged retaliation for applying for social studies position).) Plaintiff's application for a teaching position cannot, as a matter of law, constitute "protected activity" under Title VII for purposes of a retaliation claim.[5] Accordingly, because there was no evidence of any protected activity, the Court held that the retaliation claim could not survive summary judgment.[6,7]

### 4. Gender and Age Claims

Defendant also sought summary judgment on the age discrimination claim under the ADEA and the gender discrimination claim under Title VII. However, for the reasons set forth below, the Court denied summary judgment on those claims.

■ The same evidentiary framework is used to evaluate claims of discrimination based upon gender or age. *See Byrnie*, 243 F.3d at 101. To establish a prima facie case of age discrimination under the ADEA or gender discrimination under Title VII, a plaintiff must demonstrate the following: (1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. *See Terry*, 336 F.3d at 137– 38 (citing *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir.2001) (ADEA) and *Collins v. N.Y.C. Transit Auth.*, 305 F.3d 113, 118 (2d Cir.2002) (Title VII)). Once plaintiff establishes a prima facie case, the burden shifts to the defendant to " 'articulate some legitimate, nondiscriminatory reason for the' termination." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 221 (2d Cir.2004) (quoting *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996)). If the defendant carries that burden, "the burden shifts back to the plaintiff to demonstrate by competent evidence that 'the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for

---

5. To the extent plaintiff is attempting to assert a First Amendment retaliation claim under Section 1983, there is no evidence that this 2003 application for a vacant social studies position involved any constitutionally protected speech on a matter of public concern and, thus, also fails as a matter of law. *See, e.g., Frisenda v. Inc. Vill. of Malverne*, 775 F.Supp.2d 486, 503–04 (E.D.N.Y.2011). Similarly, to the extent plaintiff attempts to bring a retaliation claim under Section 1981, it fails for the same reasons that his retaliation claim fails under Title VII and Section 1983.

6. The Court also held, in the alternative, that there was no evidence from which a rational jury could find retaliation and, thus, summary judgment was warranted.

7. To the extent plaintiff attempts to bring a retaliation claim under Section 1981, such claim fails for the same reasons that it fails under Title VII.

discrimination.'" *Id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). "'The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Id.* (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089).

▇▇▇▇ To meet this burden, the plaintiff may rely on evidence presented to establish his prima facie case as well as additional evidence. Such additional evidence may include direct or circumstantial evidence of discrimination. *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 99–101, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003). It is not sufficient, however, for a plaintiff merely to show that she satisfies *"McDonnell Douglas's* minimal requirements of a prima facie case" and to put forward "evidence from which a factfinder could find that the employer's explanation ... was false." *James v. N.Y. Racing Ass'n,* 233 F.3d 149, 153 (2d Cir.2000). Instead, the key inquiry is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination. *See id.* at 153–54; *Connell v. Consol. Edison Co. of N.Y., Inc.,* 109 F.Supp.2d 202, 207–08 (S.D.N.Y.2000).

▇▇▇ Moreover, pursuant to the Supreme Court's decision in *Gross v. FBL Financial Services, Inc.,* a claimant bringing suit under the ADEA must demonstrate that age was not just a motivating factor behind the adverse action, but rather the "but-for" cause of it. 557 U.S. 167, 177–78, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009). Title VII, on the other hand, does authorize a "mixed motive" discrimination claim. *See id.* at 177 n. 3, 129 S.Ct. 2343 ("Congress amended Title VII to allow for employer liability when discrimination was a motivating factor for any employment practice, even though other factors also motivated the practice, but did not similarly amend the ADEA. We must give effect to Congress' choice." (internal citations and quotation marks omitted)).

With respect to the age discrimination claim, because the Court analyzes *infra* the Rule 50 motion under the same *McDonnell Douglas* standard, the analysis of the evidence that supported the Court's denial of the Rule 56 summary judgment motion is the same analysis that is contained herein with respect to the Rule 50 motion. Thus, for the reasons stated *infra* regarding the Rule 50 motion, the Rule 56 motion also was denied.

With respect to the gender discrimination claim, in addition to the evidence discussed *infra* which (if credited) undermined the validity of the articulated nondiscriminatory reason, there was other evidence in the record that led the Court to conclude that such evidence cumulatively created an issue of fact on whether the articulated reason for denial of tenure was a pretext for gender discrimination.[8] However, because that ruling is now moot

---

8. For example, plaintiff submitted an affidavit from his wife, who stated that, when she asked Principal Petretti why her husband was not getting tenure, he responded that her husband did not "fit the mold." (Pl.'s Summ. J. Mem. Ex X, at 2.) When she asked what mold McKenna was looking for, Petretti responded, "A young woman he can mold." (*Id.*) Plaintiff also submitted evidence that: (1) the special education department was over 95% fe-

male; (2) he was paid less than similarly situated female teachers (namely, Luanne Nappe and Ilana Kowalski); and (3) plaintiff was asked to perform special duties that female teachers were not. Although defendant disputed these facts and argued that no inference of gender discrimination could be drawn from them, the Court concluded that the evidence, if credited and construed most favorably to plaintiff, was sufficient to create a

in light of the jury's verdict in favor of defendant on that claim, the Court will not engage in a further, more detailed analysis of that decision.

### B. Rule 50(b) Motion for Judgment as a Matter of Law

#### 1. Standard of Review

The standard governing motions for judgment as a matter of law pursuant to Rule 50 is well-settled. A court may not properly grant judgment as a matter of law under Rule 50 against a party "unless the evidence, viewed in the light most favorable to the nonmoving party, is insufficient to permit a reasonable juror to find in his favor." *Arlio v. Lively,* 474 F.3d 46, 51 (2d Cir.2007) (citing *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.,* 136 F.3d 276, 289 (2d Cir.1998)). Generally, a court reviewing such a motion must defer to all credibility determinations and reasonable inferences that the jury may have drawn at trial. *See Frank Sloup & Crabs Unlimited, LLC v. Loeffler,* 745 F.Supp.2d 115, 120 (E.D.N.Y.2010). That is, a court considering a Rule 50 motion "may not itself weigh the credibility of witnesses or consider the weight of the evidence." *Meloff v. N.Y. Life Ins. Co.,* 240 F.3d 138, 145 (2d Cir.2001) (quoting *Galdieri–Ambrosini,* 136 F.3d at 289); *see also Playtex Prods., Inc. v. Procter & Gamble Co.,* No. 02 Civ. 8046 WHP, 2004 WL 1658377, at *2 (S.D.N.Y. July 26, 2004) ("A Rule 50(b) motion cannot be granted 'if, drawing all reasonable inferences in favor of the nonmoving party and making all credibility assessments in his favor, there is sufficient evidence to permit a rational juror to find in his favor.'" (quoting *Sir Speedy, Inc. v. L & P Graphics, Inc.,* 957 F.2d 1033, 1039 (2d Cir.1992))).

Thus, judgment as a matter of law is appropriately granted where "(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it]." *Advance Pharm., Inc. v. United States,* 391 F.3d 377, 390 (2d Cir.2004) (alterations in original) (quoting *Galdieri–Ambrosini,* 136 F.3d at 289); *see also Kinneary v. City of N.Y.,* 601 F.3d 151, 155 (2d Cir.2010) (same); *This is Me, Inc. v. Taylor,* 157 F.3d 139, 142 (2d Cir.1998) (stating that a court assessing a Rule 50 motion must consider whether "'the evidence is such that, without weighing the credibility of witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [people] could have reached'" (quoting *Cruz v. Local Union No. 3, Int'l Bd. of Elec. Workers,* 34 F.3d 1148, 1154–55 (2d Cir.1994))). In other words, this Court may only grant defendant's Rule 50(b) motion "if it cannot find sufficient evidence supporting the jury's verdict." *Playtex Products,* 2004 WL 1658377, at *2; *see also Black v. Finantra Capital, Inc.,* 418 F.3d 203, 209 (2d Cir.2005) ("A court evaluating [ ] a motion [for judgment as a matter of law] cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury."). For this reason, a party moving to set aside a jury verdict must clear "a high bar." *Lavin–McEleney v. Marist College,* 239 F.3d 476, 479 (2d Cir.2001).

#### 2. Defendant's Rule 50(b) Motion

Defendant moves for judgment as a matter of law on the grounds that the

---

disputed issue of fact as to whether the defendant's articulated reason for denying plaintiff

tenure was a pretext for gender discrimination.

evidence presented at trial was insufficient to establish that plaintiff's termination was a result of age discrimination. (Def.'s Mem. of Law in Supp. of Rule 50 & 59 Mots. ("Def.'s Mem.") at 2.) As set forth below, the Court disagrees and concludes that, when the evidence is viewed in the light most favorable to plaintiff, there was more than sufficient evidence from which a rational jury could find age discrimination in connection with the denial of tenure and termination of plaintiff's employment from the School District.

The Second Circuit has stated that, "[i]n reviewing a Rule 50 challenge to a verdict in favor of [a] plaintiff[ ] on a claim of age discrimination, the three-step *McDonnell Douglas* analysis applicable to motions for summary judgment provides useful guidance." *Cross v. N.Y.C. Transit Auth.*, 417 F.3d 241, 248 (2d Cir.2005). Under the *McDonnell Douglas* framework, to establish a prima facie case of age discrimination, a plaintiff must present evidence demonstrating that "(1) [he] was within the protected class; (2) [he] was qualified for the position; (3) [he] was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 498 (2d Cir.2009); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Where a plaintiff sets forth a prima facie case, " 'a rebuttable presumption of discrimination arises and the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment decision.' " *DeFina v. Meenan Oil Co., Inc.*, 924 F.Supp.2d 423, 432 (E.D.N.Y.2013) (quoting *Stratton v. Dep't for the Aging for the City of N.Y.*, 132 F.3d 869, 879 (2d Cir.1997)). This is intended " 'to force the defendant to give an explanation for its conduct, in order to prevent employers from simply remaining

silent while the plaintiff founders on the difficulty of proving discriminatory intent.' " *Id.* (quoting *Fisher v. Vassar Coll.*, 114 F.3d 1332, 1335 (2d Cir.1997) (en banc)). If an employer articulates a non-discriminatory reason for its actions, it will have successfully rebutted the presumption of discrimination, and the ball will return to plaintiff's court "to show, without the benefit of any presumptions, that 'a reasonable jury could conclude by a preponderance of the evidence that [his] age was a "but for" cause' for the adverse action." *Id.* (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010)). In sum, "[t]o establish a disparate-treatment claim under the plain language of the ADEA, [ ] a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision." *Gross v. FBL Financial Servs., Inc.*, 557 U.S. 167, 176, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009).

Here, defendant does not contest that plaintiff satisfied his prima facie burden as to age discrimination. Instead, the focus of defendant's argument is that it articulated a legitimate reason for its termination decision, and that plaintiff has not shown by a preponderance of the evidence that defendant's proffered reasons for terminating plaintiff were simply a pretext for discrimination. (Def.'s Mem. at 3.) This is so because, according to defendant, the evidence presented at trial does not establish that, but-for plaintiff's age, plaintiff would have received tenure.

In particular, defendant challenges the following evidence, discussed in greater detail *infra*. Defendant argues that it articulated a legitimate reason for plaintiff's termination, namely, that plaintiff's extra year of probation had expired, and he was a "low average" special education teacher who could not teach to the different levels of his special education students' abilities.

(*See* Def.'s Mem. at 6–7.) Further, defendant contends that the three grounds which plaintiff asserts illustrate the disparate treatment he received on account of his age (namely, parking lot duty, receiving a step decrease [9] following his placement as a full-time special education teacher, and having to enter into a JUUL agreement [10]) are not supported by evidence showing pretext. (*See id.* at 3–4.) For these reasons, defendant contends that this Court should grant it judgment as a matter of law because plaintiff has failed to meet its evidentiary burden as to pretext.

As often is the case in discrimination suits, plaintiff here does not produce direct evidence of discriminatory bias. *See Carlton v. Mystic Transp., Inc.,* 202 F.3d 129, 135 (2d Cir.2000) ("[A]n employer who discriminates against its employee is unlikely to leave a well-marked trail, such as making a notation to that effect in the employee's personnel file."). However, to be successful in such a suit, plaintiff need not present direct evidence of discrimination. *See Luciano v. Olsten Corp.,* 110 F.3d 210, 215 (2d Cir.1997) ("Direct evidence is not necessary, and a plaintiff charging discrimination against an employer is usually constrained to rely on the cumulative weight of the circumstantial evidence."). In *Reeves v. Sanderson Plumbing Products, Inc.,* the Supreme Court made clear that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, *may* permit the trier of fact to conclude

that the employer unlawfully discriminated." 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (emphasis added). Thus, in determining whether there is sufficient evidence of pretext to support a jury verdict in plaintiff's favor, a court must "examin[e] the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff'" *Schnabel v. Abramson,* 232 F.3d 83, 90 (2d Cir.2000) (quoting *Reeves,* 530 U.S. at 143, 120 S.Ct. 2097) (internal quotation marks omitted). That is, a court reviewing such evidence must consider "'the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports [or undermines] the employer's case and that properly may be considered on a motion for judgment as a matter of law.'" *Shannon v. Fireman's Fund Ins. Co.,* 156 F.Supp.2d 279, 289 (S.D.N.Y.2001) (quoting *Reeves,* 530 U.S. at 149–50, 120 S.Ct. 2097).

Here, viewing the evidence in the light most favorable to plaintiff, the non-moving party, and giving him the benefit of all reasonable inferences, the Court concludes that the evidence presented at trial is sufficient to support the jury's finding that defendant discriminated against plaintiff on account of his age when it denied him tenure or further employment with the District, and that plaintiff's age was the "but for" cause of the employment

---

9. Testimony at trial established that a "step" increase correlates to the years of experience that a teacher holds. (*See* Tr. 754:13–17.) Thus, as a teacher rises in rank at the school, his or her salary presumably will also rise correlating to his or her experience and/or step level.

10. As discussed during testimony at trial, where a decision has been made that a teacher will not be granted tenure, the district and teacher may enter into a JUUL agreement prior to the expiration of the probationary period; the effect of this will be to extend that teacher's probationary period for an additional year. *See also Levine v. Smithtown Cent. Sch. Dist.,* 565 F.Supp.2d 407, 413 n. 2 (E.D.N.Y.2008).

decision. Stated differently, the Court "cannot say that the jury's findings here were the result of 'sheer surmise and conjecture' or that fair minded persons could not have arrived at this verdict." *Stratton*, 132 F.3d at 879 (quoting *Logan v. Bennington Coll. Corp.*, 72 F.3d 1017, 1022 (2d Cir.1995)).

### a. Evidence Supporting Finding that Defendant Discriminated Against Plaintiff Because of His Age [11]

Plaintiff presented the testimony of at least fifteen witnesses and introduced documentary evidence to establish that plaintiff, through the decisions of Superintendent James McKenna ("Superintendent McKenna" or "McKenna"), was a victim of age discrimination. Based upon that testimony and documentary evidence, there were several categories of evidence which, if credited and construed most favorably to plaintiff, collectively provided a more than sufficient basis for a reasonable jury to find in plaintiff's favor.

As a threshold matter, McKenna acknowledged that, although the board of Education conducts the final approval as to a hire, his recommendation is an important, determinative factor in the process. (*See* Tr. 403:11–15.) Moreover, when questioned as to whether he had hired anyone over the age of 40 since his appointment as superintendent in 2006, McKenna stated "[t]he answer is no, I did not." (Tr. 402:23–24; *see also* Tr. 403:3–5 (Q: I'm sorry, did you hire anyone over 40 since you've been superintendent? A: The answer to that would be no.).) Shawn Petretti ("Petretti"), the principal, also testified that, in McKenna's eight years as Superintendent, Petretti was not aware of any male over 40 hired by McKenna who has attained tenure. (Tr. 310:13–17.) Of the male teachers whom McKenna hired following his appointment as superintendent, McKenna conceded that their ages were younger (specifically, 23, 24, and 25), and that the individual hired to replace plaintiff following his termination (Paul Johnson) was 25 years old. (Tr. 407:14–408:3; *see also* Tr. 378:11–19; Tr. 462:7–13.) [12]

Although not determinative on its own, *see Coleman v. Prudential Relocation*, 975 F.Supp. 234, 242 (W.D.N.Y.1997) (noting case law concluding that a terminated employee's replacement by a younger person, standing alone, is insufficient to show pretext), the fact that plaintiff's replacement was significantly younger than him is a factor (among others) from which the jury could have inferred age discrimination, *see O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996) (stating that "[t]he fact that a replacement is substantially younger than the plaintiff is a far more reliable

---

11. Prior to trial, defendant made a motion in limine to preclude certain testimony, including evidence that defendant McKenna treated female employees, as well as other employees, in an unfavorable manner. (*See* ECF No. 52.) For example, plaintiff wanted to introduce testimony from board member Debra Cahill that McKenna made her feel uncomfortable because of the way he verbally treated her and that he was sent to sensitivity training based upon her complaints, and also that he was sent to sensitivity training for allegedly anti-Semitic comments. For the reasons set forth orally on the record, the Court granted the motion to preclude testimony about alleged comments or circumstances surrounding McKenna's treatment of other individuals that did not relate to his treatment of males or to his treatment of employees based upon their age.

12. McKenna also testified that when Johnson left, he was replaced by a woman who was approximately 36 years old, and subsequently, by a man who was approximately 32 years old at the time of hire. (Tr. 462:16–463:7; Tr. 464:23–465:1.)

indication of age discrimination"); *Charrette v. S.M. Flickinger Co.*, 806 F.Supp. 1045, 1058–59 (N.D.N.Y.1992) ("Replacement by a younger employee, in connection with the other *McDonnell Douglas* criteria, although certainly not the only means by which an inference of discrimination may be shown, allows for an inference of discrimination"); *see also Haskell v. Kaman Corp.*, 743 F.2d 113, 119 n. 1 (2d Cir.1984) (same); *Strohmeyer v. Int'l Broth. of Painters & Allied Trades*, 989 F.Supp. 455, 459 (W.D.N.Y.1997) (finding as a relevant factor in summary judgment analysis of age discrimination claim the fact that plaintiff's alleged replacement, following plaintiff's termination, was younger than plaintiff).

Second, there were several statements, attributed to Superintendent McKenna and concerning plaintiff, which, in the context of the other evidence in the case, could be reasonably construed by a jury as constituting evidence of age discrimination. For instance, plaintiff's wife, Mary Claudio ("M. Claudio"), testified that sometime around April 2009, after plaintiff learned that he would not be receiving tenure, McKenna made a comment to M. Claudio "about [plaintiff] being an old dog and teaching old dogs new tricks." (Tr. 541:17–18.) Specifically, M. Claudio testified:

> Q: Now I'm going to refer you—well, you testified that Mr. McKenna made a statement about teaching an old dog new tricks. When did he make that statement?
>
> A: I said he made it in April of 2009.
>
> Q: And who did he make that statement to?
>
> A: Me.
>
> Q: And was that at the board meeting?
>
> A: No. It was in the school. I asked him where this came from. He had

signed a JUUL agreement that he was going to be observed for a year.

> Q: What was his response?
>
> A: And he said he can't teach an old dog new tricks and he walked away from me.

(Tr. 543:19–544:8.)

School board member Janique Nine ("Nine") testified that, prior to the start of the April 16, 2009 executive session, at which meeting the school board members decided against granting plaintiff tenure, McKenna informed her that "[h]e felt that we were going in a new direction with special ed and that [plaintiff] was, he had an old school style." (Tr. 523:17–19.)

In addition, Barbara Smith ("Smith"), a teacher at the District, as well as plaintiff's sister-in-law, testified concerning her involvement with the employment committees for hiring at the school. (Tr. 201:13–203:7). Smith stated that the resumes the committee reviewed typically were "very heavily women oriented" (Tr. 202:2–3), and that the candidates were "young, young" (Tr. 202:19). Smith also noted that, on one occasion, McKenna expressed to her that he wanted to hire young people whom he could mold. (*See* Tr. 203:4–7 ("Yes, he likes to hire young people. He likes to hire young people that he can mold, is what Jim [McKenna] told me. He wants to mold them so they become the teacher and they become the person that he wants them to be.").) Smith further testified as to her recollection of one hire the employment committee made, a Jackie Portacaro, whom she believed was in her "mid to late 20s[,] [y]oung" (Tr: 215:1–2), when she was hired, and whom McKenna had commented upon favorably during the hiring process (Tr. 214:24–215:8).

The Court recognizes that each of these statements, standing alone, would certainly not be sufficient evidence to sustain a verdict for plaintiff. However, such state-

ments, when considered in the context of the other evidence introduced at trial, could have been reasonably construed by the jury to indicate a preference on McKenna's part for younger hires, and also, to support the jury's finding that McKenna's decision as to plaintiff was motivated by a discriminatory animus (here, age).

Third, plaintiff proffered several instances of differential treatment that he received while employed at the District that he attributed to, *inter alia,* his age. For example, plaintiff presented evidence that, when he was hired as a full-time special education teacher, he was placed at a step one level, despite the fact that he already had been employed with the District for several years, and despite the fact that other, younger individuals were hired and placed at a higher step. In particular, he testified:

Q: Can you tell me, when you started with the district in 2001 what step did you start at?

A: ... [I]n 2002–2003, I was given step one. 2003–4, when I was four-fifths, I was given step two. And in 2004–2005, when I was one-fifth teacher, I went to step three.

Q: Even as a one-fifth teacher?

A: As a one-fifth teacher I went to step three. And then for some reason in 2005–2006 when I became a full-time teacher they knocked me back down to step one.

Q: Do you know of any other teachers that suffered this type of treatment?

A: No, I do not.

Q: In particular do you know of any other teachers that were similarly situated that got step increases as opposed to decreases?

A: There were teachers that got, you know, they were just student teaching and they kept their steps starting over.

Q: Do you know any teachers in particular, by name?

A: Ilana Kowalski was one. I know another teacher who came into the district; just because she had business experience, they gave her a step.

Q: What was her name?

A: Luanne Nappe.

Q: Are both those teachers female?

A: Both female.

Q: Both less than 40?

A: Less than 40.

(Tr. 564:18–565:23; *see also* Tr. 688:14–15; Tr. 692:25–693:20.)

Smith's testimony corroborated plaintiff's statements on this issue. She testified that when plaintiff first began working full-time for the District, he started at a "step one" level, even though he had already been working with the District for "[a] number of years before that," and even though there were other female teachers—under the age of 40—who were hired at an elevated step. (Tr. 205:1–206:24.) Smith further noted that there is no step lower than a step one. (Tr. 205:8–9.) When asked if she knew of other teachers who had been "knocked down a step," Smith stated that she did not. (Tr. 204:1–3; Tr. 207:21–23.) Likewise, school board member Debra Cahill ("Cahill") testified that when Kowalski, a younger female teacher, was hired at a high step, she questioned this decision. (Tr. 242:12–23.)

In addition to a step decrease, plaintiff argued that the unprecedented circumstances surrounding the JUUL agreement also raised an inference of age discrimination. Specifically, there was testimony that plaintiff had to sign a JUUL agreement, which had the effect of extending his probationary term for another year, but

which, if not signed, would leave plaintiff unemployed. (Tr. 657:15–658:2; *see also* Tr. 671:5–10 (Q: Now, Mr. Claudio, you claim that the district made you sign the JUUL agreement. Correct? A: Correct. Q: And the alternative would have been that you would have been out of a job. Correct? A: And lose pay. Yes.); Tr. 678:8–9; Tr. 686:2.) Both plaintiff and his wife's respective testimonies made clear that plaintiff's signing of the JUUL agreement was done under pressured circumstances, in which plaintiff understood that if he did not sign the agreement, he would not have a job and would lose all of his benefits (particularly necessary at the time, given his wife's then health condition). Plaintiff's wife, M. Claudio, stated:

> Q: I show you, Miss Claudio, Plaintiff's Exhibit 10 in evidence and ask you, do you know what that document is?
>
> A: Yes, I do.
>
> Q: And was that the subject of Mr. Petretti's calling you in his office?
>
> A: Yes. Well, it was one of two subjects.... He said that [plaintiff] was going to be given this [JUUL] letter and that he better sign it as is because if it was not signed as is, without making any changes, he reminded me that I had cancer and I needed insurance, and if this was not signed as is, no questions asked, [plaintiff] would be terminated immediately and we would lose the insurance and I could not have that because of my cancer.
>
> Q: Did your husband sign it immediately?
>
> A: ... He took it. He signed it as is.

(Tr. 537:24–538:15.)

Other witnesses' testimony, including Nine's and plaintiff's, also suggested that the signing of the JUUL agreement was not a common practice by the District, and that to their recollections, no other teacher had been required to sign such a document. (*See* Tr. 144:8–18; Tr. 147:5–11; Tr. 570:6–8.) Further, Nine testified that at the time McKenna offered plaintiff the JUUL agreement, he was acting without the school board's resolution.[13] (Tr. 151:6–13.)

Other testimony similarly suggested that the entire process surrounding plaintiff's receipt of a probationary year, subsequently followed by termination, was unusual. Nine noted that at the April 2009 meeting, in which the school board voted upon whether or not plaintiff's probationary appointment should end, the resolution before the board did not say anything about denying plaintiff tenure. (Tr. 166:23–167:6.) She also stated that she did not know why the resolution upon which they all were to vote was framed as whether plaintiff's probationary year should end, as opposed to whether he should receive tenure. (Tr. 164:22–165:3.) Additionally, Nine testified that an attorney spoke at the executive session and expressly addressed the issue of plaintiff's employment, which, to Nine's recollection, had never been done before. (Tr. 167:19–168:1.) School board member Cahill stated that the manner in which the April 16, 2009 school board meeting was conducted—during which plaintiff was denied an extension of his probationary year (and thereby tenure)—was "out of the ordinary." (Tr. 234:13–25.) Lynne Krauza ("Krauza"), a school board member, noted that untenured teachers (like plaintiff) typically are evaluated more often than tenured teachers, but that during plaintiff's last year of employment, she did not see any evalua-

---

**13.** Other witnesses, such as board member Nine, testified that the board authorized the JUUL agreement. (Tr. 153:17–154:1.)

tions in his file, and that in her experience, she had not heard of a principal doing an evaluation and failing to write it up. (Tr. 712:3–713:2.) McKenna himself conceded in his testimony that, during his tenure of superintendent, he could not recall another teacher being terminated by the same or similar method as plaintiff had been. (Tr. 413:15–414:12.) McKenna additionally stated that the March 30, 2009 letter (the "March letter" or "March bullet point letter") constituted plaintiff's evaluation for his last year of employment, and that in his twenty-five years of experience, he had never seen an evaluation (in the form of a bullet point letter setting for the supposed grounds for termination) like that. (Tr. 387:1–24.) McKenna also admitted that he had never terminated another teacher, other than plaintiff, at a televised board meeting. (Tr. 415:20–22.) Krauza testified similarly, stating that in her experience, no other teachers in the District had been fired other than plaintiff. (*See* Tr. 727:23–728:2.)

The Court recognizes that defendant submitted evidence to counter plaintiff's claims that the purported differential treatment he received was related to his age. For example, on the issue of a step increase, McKenna testified that (1) his decision regarding plaintiff's step level did not relate to plaintiff's age; (2) a number of factors are taken into account before determining an individual's appropriate step level, including that individual's experience and budgetary considerations; and (3) there was one teacher over 40 who had received a higher step. (Tr. 754:13–763:8.) Similarly, with respect to the alleged unusual circumstances surrounding the JUUL agreement, McKenna testified that he had already made the decision in 2008 that he was not going to grant tenure to plaintiff, and that the JUUL agreement's extension of plaintiff's probationary term for one year was done simply to "soften

the blow" before termination of his employment in 2009. (Tr. 459:1–60:12.) Thus, defendant argued that any further evaluation of plaintiff during that one-year extension was pointless because plaintiff was not going to be granted tenure. Similarly, McKenna testified that the tenure issue was not submitted for a formal board vote because, under the law, tenure cannot be granted by the board without a recommendation of the Superintendent. (*See* Tr. 412:15–13:19.) He further stated that no other teacher had ever been terminated in this manner because, generally, teachers who are told that they are not going to be recommended for tenure will resign before termination. (Tr. 416:2–18.)

Obviously, it was the province of the jury to resolve the conflicting evidence on these various issues, and also, to determine what reasonable inferences should or should not be drawn therefrom. In this case, all of plaintiff's evidence was credited and all reasonable inferences were drawn in his favor. These circumstances, including those surrounding the JUUL agreement and McKenna's dealings with the Board regarding plaintiff's employment, could rationally support the jury's verdict in favor of plaintiff's age discrimination claim. In any event, the Court notes that the other evidence discussed herein (apart from the step issue, the JUUL agreement, and the board's vote) was more than sufficient to rationally support the jury's verdict.

In sum, based on the evidence in the record, including an assessment of the witnesses' credibility, the Court concludes that the jury could have rationally inferred that defendant's age was the "but for" reason for McKenna's decision not to grant plaintiff tenure or another form of employment.

# 140

### b. Other Evidence Rebutting the Articulated Non–Discriminatory Reason

It is well-settled that a plaintiff, in conjunction with other evidence, may demonstrate pretext in a discrimination case by pointing to "weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nondiscriminatory reason for its action.'" *Shannon*, 156 F.Supp.2d at 291 (quoting *Cruse v. G & J USA Publ'g*, 96 F.Supp.2d 320, 329 (S.D.N.Y.2000)). Here, in addition to the above-referenced evidence that could rationally be used by the jury to support an age discrimination claim, plaintiff also presented evidence that (if credited) directly countered defendant's proffered legitimate reason for terminating plaintiff, *i.e.*, that he was a "low average" special education teacher who could not teach to his special education students' differing levels of abilities.

First, there was evidence that there was an abrupt change by Superintendent McKenna in the decision to deny tenure to plaintiff, including (1) testimony from board member Nine that McKenna told her, in approximately 2007, that he was going to give tenure to plaintiff (Tr. 143:22–144:7; Tr. 522:17–25); (2) Petretti testified that, after an administrative meeting with McKenna and others in late 2007/early 2008, he had the impression that plaintiff was going to receive tenure (*see* Tr. 251:18–23 (Q: You told [plaintiff] that Jim McKenna said you're going to get tenure? A: The exact words, I can't recall the exact words. I can state that I was under the impression coming out of the meeting, the conversation on whether or not Tony would get tenure and informally

that answer was yes.... We have a conversation, debate, which was ongoing in this instance, and at some point in time the administrative team seemed to be in agreement that Tony would get tenure.")); and (3) Petretti then advised plaintiff informally, in the winter of 2007–2008, that he was "pretty confident" plaintiff was going to receive tenure (Tr. 250:9–251:1; *see also* Tr. 295:23–25 ("I felt confident that [plaintiff] would be recommend [sic] for tenure and I expressed that to him.")).[14]

Second, board member Nine testified that there was nothing in plaintiff's teaching records in 2008 that would have led her to believe that plaintiff would not be granted tenure (Tr. 145:23–25), and further, that as of April 2009, she believed that plaintiff should get tenure (Tr. 154:16–23). Similarly, board member Cahill testified that she was not aware of anything in plaintiff's file that suggested that plaintiff should not get tenure (Tr. 235:20–22); she also stated that she believed that plaintiff should get tenure (Tr. 229:16–17).

Petretti, the school principal, also concluded (at least initially) that plaintiff should receive tenure (Tr. 251:15–23), and testified that Patricia Desiderio ("Desiderio"), the Director of the Special Education Department, was supportive of plaintiff's receipt of tenure (Tr. 294:20–295:2).[15] Specifically, Petretti testified that he had given plaintiff a good recommendation in the spring of 2007. (*See* Tr. 263:5–264:6; Tr. 312:10–25.) Additionally, Petretti stated that he had advocated for plaintiff to receive tenure based on his abilities (Tr. 313:1–5), and that he, as school principal, wanted plaintiff to receive tenure (Tr. 251:15–17).

**14.** Plaintiff testified that Petretti called him into his office in the middle of the 2007–2008 school year and told him, "Congratulations. You are getting tenure." (Tr. 648:10–17.)

**15.** Desiderio denied that she was supportive of plaintiff receiving tenure. (Tr. 341:14–22.)

Plaintiff also called other witnesses, including school psychologist Elisabeth Terry ("Terry") (Tr. 180:8–195:5), school guidance counselor coordinator Brian Lynch ("Lynch") (Tr. 218:8–224:9), and teaching assistant Marland Henderson ("Henderson") in the special education department (Tr. 473:20–479:25), to testify that they were not aware of any problems with plaintiff's performance as a special education teacher. For example, teaching assistant Henderson testified that "[plaintiff] was an excellent teacher in my purview." (Tr. 478:6–7.) Guidance counselor Lynch testified that he did not recollect any of plaintiff's students having a problem that reflected against plaintiff's ability as a teacher. (Tr. 222:1–7.)

Additionally, plaintiff offered testimony directly calling into question defendant's supposed grounds for plaintiff's termination, which it claims were set forth in the March bullet point letter. Whereas McKenna testified that plaintiff's employment with the District was terminated due to "[t]he five reasons stated on the letter of March 30th, 2009" (Tr. 418:20–21), school board member Andrew McGowan ("McGowan") testified that he had never seen the March bullet point letter during his time on the school board, and that he did not recall any discussions during executive session wherein the five reasons listed for plaintiff's termination ever were discussed (Tr. 94:10–96:10). School board members Cahill and Nine testified similarly, stating that while there had been a discussion amongst the school board and McKenna in 2008 concerning plaintiff's employment, ultimately leading to his being offered a probationary year instead of tenure, none of the reasons set forth in the March bullet point letter ever were mentioned or debated. (Tr. 151:14–152:7; Tr. 233:19–234:3.) Plaintiff testified that the five bullet points supposedly summing up the grounds for his termination were never

discussed with him either in 2008, prior to his acceptance of the probationary year, or in 2009, during the time of his termination. (Tr. 570:13–571:22.) On reviewing the contents of the March letter during her testimony, special education department school psychologist Terry testified as to her disagreement with its representations as to plaintiff's abilities. (*See* Tr. 183:15–184:8.) Plaintiff also testified that the grounds for denying him tenure, related to his performance, were not true. (Tr. 686:2–688:6.)

Defendant makes no explicit argument concerning the March 2009 letter in its motion, instead resting on its claim that plaintiff was a low average teacher and citing to testimony from Desiderio, the Director of Special Education at the District, who stated similarly. (*See* Def.'s Mem. at 7 (citing Tr. 357–58).) McKenna also testified to plaintiff's performance deficiencies. However, the jury here is the ultimate barometer as to the credibility of witnesses. *See Denman v. Sanders,* No. 05 Civ. 0025(RLE), 2006 WL 452018, at *3 (S.D.N.Y. Feb. 24, 2006) (reviewing a Rule 50(b) motion and stating that "[t]he Court ... must defer to the jury's credibility determinations"). In light of the various witnesses who testified as to plaintiff's excellent performance, and who also had never heard of the March letter or its stated grounds for termination, the jury could have chosen to credit that testimony over that of Desiderio, McKenna, and other defense witnesses. *See Halica v. Singer,* 511 Fed.Appx. 27, 28 (2d Cir.2013) (noting that when reviewing a Rule 50(b) motion, the court "must give deference to all credibility determinations and reasonable inferences of the jury, and may not weigh the credibility of witnesses or otherwise consider the weight of the evidence").

Thus, there was sufficient evidence from which a reasonable jury could conclude

that defendant's articulated legitimate reason for termination (*i.e.,* that plaintiff was a low average special education teacher who could not teach to his students' differing levels of abilities) was not valid. *See Shannon,* 156 F.Supp.2d at 290 ("While a court must respect an employer's decision to choose among qualified candidates, it is well recognized that an employer's disregard or misjudgment of a plaintiff's job qualifications may undermine the credibility of an employer's stated justification for an employment decision."); *see also Byrnie,* 243 F.3d at 103 (same). If plaintiff's evidence was credited, the jury could have rationally inferred that plaintiff had sufficient qualifications so as not to be denied tenure. Although this inference, on its own, might not be sufficient to show pretext, it holds probative value when considered in combination with the other evidence in the record. *See Shannon,* 156 F.Supp.2d at 290. Here, when the evidence undermining the articulated reasons for the employment decision is considered along with the other evidence in the record from which an inference of age discrimination might rationally be drawn, it is clear that there was sufficient evidence from which the jury might reasonably find that defendant's articulated reasons for denying plaintiff tenure and for terminating plaintiff's employment were a pretext for age discrimination.

In sum, viewed in a light most favorable to plaintiff, the non-moving party, the various evidence presented at trial (including the testimony from plaintiff, plaintiff's wife, McKenna, school employees, and school board members) provided sufficient evidence from which a reasonable jury could conclude that the District (through McKenna) was motivated by a discriminatory animus—specifically, age—when it decided to deny plaintiff tenure or offer him another position, and that its proffered reasons for denying plaintiff tenure

or other employment were pretextual. The combination of the evidence establishing plaintiff's prima facie case, along with the jury's finding of pretext, is more than sufficient to sustain the jury's ultimate conclusion that age discrimination was the "but for" cause of the decision. *See Stratton,* 132 F.3d at 881; *see also St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (stating that factfinder's rejection of defendant's proffered reasons, combined with plaintiff's prima facie case showing, is sufficient to allow factfinder to infer intentional discrimination). Accordingly, defendant's Rule 50 motion is denied.

## C. Rule 59 Motion for a New Trial

Defendant's second post-trial motion is a motion for a new trial under Federal Rule of Civil Procedure 59. Defendant proffers two grounds upon which it contends a new trial is warranted: (1) the verdict was against the weight of the evidence, and (2) plaintiff's counsel's improper conduct pervaded trial to such an extent that it improperly influenced the jury's verdict. The Court examines each of these arguments in turn.

### 1. Standard of Review

Rule 59(a) states that a court may grant a new trial in a jury case for any of the reasons "for which a new trial has heretofore been granted in an action at law in federal court." Fed.R.Civ.P. 59(a). The decision whether to grant a new trial under Rule 59 "is 'committed to the sound discretion of the trial court.'" *Stoma v. Miller Marine Servs., Inc.,* 271 F.Supp.2d 429, 431 (E.D.N.Y.2003) (quoting *Metromedia Co. v. Fugazy,* 983 F.2d 350, 363 (2d Cir.1992)). Thus, "[a] new trial may be granted [ ] when the jury's verdict is against the weight of the evidence." *DLC Mgmt. Corp. v. Town of Hyde Park,* 163 F.3d 124, 133 (2d Cir.1998). In contrast to

the previously-considered motion for judgment as a matter of law, a court may grant a motion for a new trial "even if there is substantial evidence supporting the jury's verdict." *Id.* at 134. Additionally, "a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner." *Id.* (citing *Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1047 (2d Cir.1992)). A court considering a Rule 59 motion for a new trial, however, "must bear in mind [ ] that the court should only grant such a motion when the jury's verdict is 'egregious.' " *Id.* For this reason, "[a] motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Munafo v. Metro. Transp. Auth.*, 381 F.3d 99, 105 (2d Cir.2004) (quoting *Atkins v. New York City*, 143 F.3d 100, 102 (2d Cir.1998)); *see also Patrolmen's Benevolent Ass'n of N.Y.C. v. City of N.Y.*, 310 F.3d 43, 54 (2d Cir.2002). Furthermore, "[w]here the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial." *Fugazy*, 983 F.2d at 363; *see also DLC Mgmt. Corp.*, 163 F.3d at 134 ("[A] court should rarely disturb a jury's evaluation of a witness's credibility.").

### 2. Whether the Verdict Was Against the Weight of the Evidence

█ Defendants do not expressly argue in the Rule 59 section of their brief as to why the jury's verdict is not supported by the weight of the evidence. (*See* Def.'s Mem. at 7–27.) Accordingly, the Court assumes that defendant moves in the alternative for a new trial on the same grounds for which it moves for judgment as a matter of law.

Each of defendant's arguments rejected on its Rule 50(b) motion are also rejected as to the Rule 59 motion because defendant has not shown as to those grounds that "the jury has reached a seriously erroneous result . . . or [that] the verdict is a miscarriage of justice." *Song*, 957 F.2d at 1047 (quoting *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 370 (2d Cir. 1988)) (internal quotation marks omitted). In this case, as discussed in detail in connection with the Rule 50(b) motion, the jury's verdict was fully consistent with the weight of the evidence which, based upon its verdict, the jury found to be credible. Petretti, Smith, Terry, Lynch, Henderson, Nine, Cahill, and McGowan all testified with substantial consistency concerning plaintiff's favorable qualities and abilities as a teacher. Several witnesses (including Smith, M. Claudio, and Nine) testified as to comments that Superintendent McKenna made, which the jury could have reasonably construed as being related to age; there was also other evidence presented as to the age of actual hires he had made during his period of tenure as Superintendent. Several witnesses (including plaintiff, Smith, Cahill, Nine, and Krauza) noted the different treatment plaintiff received— as compared to other District employees— during his period of employment. Additionally, various school board members offered testimony establishing that they were not aware of the March letter, setting forth the grounds for plaintiff's termination, despite the fact that they were on the board responsible for assisting the superintendent in such decisions. They further testified that the circumstances leading up to and culminating in plaintiff's termination from the District deviated from normal tenure-determination practice. Additionally, although Superintendent McKenna denied that age played any role in the termination decision, and further, gave non-discriminatory reasons for

his decision (and the circumstances surrounding it), the jury also could have considered McKenna's acknowledgment that he had not hired a male teacher over the age of 40, that plaintiff's replacement was significantly younger than plaintiff, that the evaluation plaintiff received during his final year of employment was atypical, and that the circumstances surrounding plaintiff's denial of an additional probationary year (and ultimately, employment) were unusual, to the point where McKenna could not recall another teacher being terminated in the manner in which plaintiff was. For these reasons, the Court concludes that the body of the evidence supports the jury's conclusions. To the extent defendant's Rule 59 motion rests expressly or impliedly upon the weight of the evidence as a ground for seeking a new trial, it is denied.

### 3. Counsel's Conduct

█ Defendant additionally argues that a new trial is warranted on account of plaintiff's counsel's (Frank Blangiardo ("Blangiardo")) alleged misconduct during trial. In particular, defendant asserts that a new trial is appropriate because of the following factors: counsel's remarks regarding fraud and plaintiff's signing of the JUUL agreement, counsel's inserting himself as a witness in the case, counsel's comments and line of questioning concerning the videotape of the April 16, 2009 board meeting, counsel's physical and facial gestures, and counsel's opening argument and summation. The Court considers these elements in turn, first addressing the relevant legal standard.

Notably, "not all misconduct of counsel taints a verdict to such a degree as to warrant a new trial. Only when the conduct of counsel in argument causes prejudice to the opposing party and unfairly influences a jury's verdict is a new trial warranted." *In re Fosamax Prods. Liab.*

*Litig.*, 742 F.Supp.2d 460, 477 (S.D.N.Y. 2010) (quoting *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 540 (2d Cir. 1992)) (internal citations and quotation marks omitted). Thus, a court addressing a motion for a new trial based on trial counsel's misconduct "must consider such a claim in the context of the trial as a whole, examining, among other things, the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, and the manner in which the parties and the court treated the comments." *Levitant v. N.Y.C. Human Res. Admin.*, 914 F.Supp.2d 281, 311 (E.D.N.Y. 2012) (quoting *In re Fosamax*, 742 F.Supp.2d at 477) (internal quotation mark omitted). It is well-accepted that "the judge who was present throughout the trial [ ] is best able to determine the effect of the conduct of counsel on the jury." *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1289 (2d Cir.1990). Furthermore, trial courts "possess broad discretion to determine when the conduct of counsel is so improper as to warrant a new trial." *Matthews v. CTI Container Transp. Int'l Inc.*, 871 F.2d 270, 278 (2d Cir.1989). When "ruling on a motion for a new trial based on attorney misconduct, the trial court must determine whether counsel's conduct created undue prejudice or passion which played upon the sympathy of the jury." *Strobl v. N.Y. Mercantile Exch.*, 582 F.Supp. 770, 780 (S.D.N.Y.1984); *see also Pappas*, 963 F.2d at 540 (stating that only "when the conduct of counsel in argument causes prejudice to the opposing party and unfairly influences a jury's verdict" will a new trial be appropriate).

At the outset, the Court acknowledges that Blangiardo's behavior during trial was certainly inappropriate at times. However, this conduct was not as widespread as defendant suggests, nor did the conduct go

without remedy at trial. The Court first addresses defendant's claims regarding Blangiardo's opening statements, and then turns to defendant's main contentions with counsel's inappropriate behavior at trial—namely, counsel's remarks regarding fraud, counsel's inserting himself as a witness in the case, counsel's comments and line of questioning concerning the videotape of the April 16, 2009 board meeting, counsel's physical and facial gestures, and counsel's summation.

### a. Opening Statement

Defendant points to several comments made by Blangiardo during his opening statement which it contends were improper, made in bad faith, and were prejudicial to defendant. Defendant notes the following: (1) Blangiardo's comments that the case concerned matters involving fraud and material misrepresentations on the part of the District, stating that "[i]n the law we have misrepresentations, some of them are material[;] [h]ere, we have many, many, material misrepresentations" (Tr. 33:24–34:1), and "[t]here's also fraud[;] [f]raud is not a word that I throw around lightly in the federal courthouse" (Tr. 34:4–5); (2) counsel's statements that Superintendent McKenna took actions "to amalgamize power" (Tr. 31:7), including making his personal secretary the District Clerk, thereby making McKenna District Clerk *de facto*; (3) Blangiardo's comments accusing McKenna of, for all intents and purposes, tampering or manipulating the employee hiring process, including statements that McKenna "employed Mr. Venator [the District's counsel] on a campaign to get [his] client and terminate him" (Tr. 31:18–20), that McKenna "manipulates the resumes on the hiring committee" (Tr. 35:3–4), that McKenna made a videotape of the April 16, 2009 school board meeting "disappear" (Tr. 35:21–23), and that McKenna keeps determinations concerning

tenure "absolute[ly] secret" (Tr. 36:6–7); and (4) Blangiardo's statements to the effect that "we live in a small District" and "[i]t's a small community that we live in and it's very humiliating" (Tr. 39:18; Tr. 39:21–22).

There is nothing in Blangiardo's opening that would provide grounds for a new trial. First, the jury was instructed during Blangiardo's opening statement (following an objection from defense counsel) that "what the lawyers say [during opening statements] is not evidence. This is what they expect the evidence to show." (Tr. 30:25–31:2.) Further, the main portion of Blangiardo's opening statement addresses the different witnesses whom Blangiardo intended to call, as well as what he anticipated their testimony would show, including the type of disparate treatment that plaintiff experienced during his employment, the unusual nature surrounding his denial of tenure, and the disparities in age and gender in the District's hiring process.

Second, plaintiff's counsel is entitled to articulate his theory of the case to the jury in his opening statement. Thus, there was nothing improper with counsel's attempt, in his opening, to portray Superintendent McKenna as an individual who wanted his client to be terminated for unlawful reasons, and who was using his authority in a secretive manner to accomplish that objective. Similarly, as discussed *infra*, counsel was permitted to suggest to the jury that he would attempt to prove that the videotape of the April 16, 2009 school board meeting was intentionally discarded.

Third, to the extent that counsel's use of adjectives such as "fraud" and "material misrepresentations" could potentially confuse the jury in a discrimination case, those comments mirrored other statements (addressed *infra*) that counsel made later in trial (which defendant also challenges here), and which were objected

to at trial and/or remedied by a warning to Blangiardo and/or a curative instruction to the jury.

Finally, defense counsel only objected once during Blangiardo's opening statement. Although the Court recognizes that there may have been tactical reasons underlying defense counsel's decision not to object during opening statements, her failure to object to comments that she now asserts were sufficiently unfair and prejudicial so as to provide grounds for a new trial is, nonetheless, a relevant factor.

Thus, viewing these comments under the totality of the circumstances, the Court cannot say that they give rise to grounds warranting a new trial. Given the evidence presented at trial, which, for the reasons set forth *supra,* was sufficient for purposes of establishing age discrimination, the Court concludes that these statements, to the extent they were objectionable, did not impact the outcome of the trial. The Court is satisfied that, in light of the various curative instructions given throughout the trial, which targeted the same issues now challenged as occurring in the opening statement, as well as the overall evidence presented, defendant was not prejudiced by plaintiff's counsel's comments during his opening statement.

### b. Counsel's Focus on Irrelevant, Confusing, and Prejudicial Evidence

Defendant contends that plaintiff's counsel introduced certain matters that were irrelevant to the case at hand, confusing to the jury, and that prejudiced defendant. Specifically, defendant contests Blangiardo's focus at trial on fraud-themed questions, plaintiff's signing of a JUUL agreement, and the missing whereabouts of a videotape of the April 16, 2009 board meeting, during which plaintiff's tenure/employment status was discussed. The Court addresses each in turn.

### i. Allegations of Fraud and the JUUL Agreement Line of Questioning

Defendant claims that Blangiardo inappropriately pursued a line of questioning concerning the JUUL agreement and, relatedly, improperly attempted to insert a fraud theory into the case. Because these arguments parallel one another in terms of the incident contested and the remedy offered, the Court addresses these matters concurrently.

Defendant argues that Blangiardo's focus on the JUUL agreement transformed an employment discrimination case into one concerning fraud and breach of contract. (Def.'s Mem. at 16.) Specifically, defendant asserts that (1) the JUUL agreement was irrelevant to the underlying discriminatory claims, particularly given that it inured to plaintiff's benefit (*id.*); (2) Blangiardo used the JUUL agreement to "manipulate and confuse the jury to believe that the Superintendent, the District's counsel and District's clerk acted in a lawless manner" (*id.*); (3) despite the Court's various instructions, Blangiardo continued questioning witnesses concerning the JUUL agreement (*id.* at 18); (4) the upshot of Blangiardo's JUUL-focused line of questioning was to falsely accuse the District of fraud, confuse the jury, besmirch the Superintendent's reputation, and ultimately transform the case into one of fraud and contractual breach, not of discrimination (*id.* at 16–18); and (5) in addition to Blangiardo's comments made during his opening statement (discussed *supra*) and summation (discussed *infra*), Blangiardo at times stated his questions in an argumentative manner, inappropriately raising a fraud theme in his phrasing and improperly suggesting fraudulent activity on the part of the District.

There can be no doubt that Blangiardo questioned various witnesses concerning

the JUUL agreement. (*See, e.g.,* Tr. 146–51; Tr. 256–57; Tr. 315–16; Tr. 392–395; Tr. 720–26.) Moreover, it is clear from the record that Blangiardo's form of questioning now and again either directly or implicitly targeted the issue of fraud. However, the Court disagrees with defendant to the extent it suggests that the circumstances surrounding the JUUL agreement were completely irrelevant. As discussed *supra,* the circumstances surrounding the decision to offer plaintiff a JUUL agreement were a relevant subject matter in connection with plaintiff's claim, and plaintiff was permitted to try to prove—and argue—that the reasons given to him in 2008 for denying him tenure, as well as the reasons articulated by defendant for offering the JUUL agreement, were pretextual. In essence, although pretext concerning the JUUL agreement was a relevant inquiry, plaintiff's counsel chose to use the word "fraud." Similarly, although plaintiff's counsel was permitted to inquire as to whether the terms of the JUUL agreement were honored by defendant (again, on the issue of pretext), the Court was concerned that the jury might be confused that a breach of the JUUL agreement, or some type of fraudulent inducement in connection with the JUUL agreement, could be a separate ground for liability. Therefore, the Court cautioned Blangiardo from pursuing either the topic of fraud or the breach of the JUUL agreement as separate theories of liability.

For example, following Blangiardo's examination of Petretti, the Court cautioned Blangiardo against utilizing questions concerning the JUUL agreement in order to plant seeds of separate claims of fraud or breach of contract in the jury's mind. Thus, although the Court instructed Blangiardo that he could argue that the circumstances surrounding the JUUL agreement suggested pretext, the Court made clear that he should not suggest, through questions or arguments, that there was a separate claim for fraud or breach of contract. Further, the Court stated that, because Blangiardo had suggested that the procedures employed by McKenna, with respect to his powers in relation to the board, were questionable under New York law, the Court needed to instruct the jury on what decisionmaking authority the Superintendent has under New York Education Law. Specifically, the Court stated:

> The Court: And although your claims are gender and age, I will have an instruction. I think it's important that [the jury] understand what the law is in that area so that they're not speculating as to whether or not the superintendent was acting contrary to his authority in connection with your client. . . .

> \*　\*　\*

> Mr. Blangiardo: Your Honor, I'm not finished with my case. I think it's clear we have a foundation for fraud.

> The Court: You don't have a claim for fraud.

> Mr. Blangiardo: I know, but it goes towards the witness and the JUUL agreement and the promise for observations. With regard—

> The Court: . . . You don't win this case if they defrauded your client in connection with the JUUL agreement. There's no claim that allows you to recover if they defrauded him on the JUUL agreement. You only win if they were motivated by age or gender. You're proving and I noted it [in] my notes in your opening you did make reference to this case about fraud and another reference that I wrote down, because I was surprised to [hear] it, retaliation. . . . There isn't retaliation. You're throwing these things out there and the jury is not going to go back with a misunderstanding we don't like what

the [D]istrict did with the JUUL agreement and they misled him, we should give him money. They're not allowed to do that.

Mr. Blangiardo: I understand, your Honor. However, these are the facts of the case . . .

The Court: They may be the facts of [the] case, but they have to be relevant and the jury has to understand what the relevance is. *If an employer is invoking some procedure they never invoked before or the supervisor acts without authority in connection with a decision that could be some potential for relevance as a pretext which is why I have allowed you to go into this area, but the jury is not going to be misled into believing that's what happened here if in fact there is New York law that supports the procedure that was used.* Those may be the facts, but the jury now, because you have put those facts in and are making argument that it's fraud, needs to know what New York law [is]. They're not going to sit back there wondering is this fraud or not. . . . Before I give that instruction I'll them this case is about gender and age. Those are the claims here. I don't want you to say this is a case about fraud because that leads the jury to believe we're trying to find whether or not he was defrauded or not.

(Tr. 322:3–8; Tr. 323:12–324:9; Tr. 325:1–15; Tr. 325:18–22 (emphasis added).) The Court then noted that, although it intended to give an instruction to the jury to avoid any potential confusion, it was not certain yet whether it would wait until the end of the case or if it would do so during trial. (Tr. 326:20–24.)

During Blangiardo's examination of Superintendent McKenna, the Court again cautioned plaintiff's counsel about keeping his case centered on age and gender dis-crimination. (Tr. 498:14–17 (The Court: [T]his is an age and gender case and my goal is to make sure it stays an age and gender case and doesn't branch out into other claims of fraud or breach of a JUUL agreement.); Tr. 498:20–25 (The Court: You're suggesting to the jury, look, they didn't follow the JUUL agreement. If they didn't follow the JUUL agreement, he doesn't win. Their decision has to be made on age or gender. These are other things that you're focusing on and my job is to make sure the jury understands what their role is.).) The Court then decided to instruct the jury at that point in time, rather than wait until the end of trial. (Tr. 497:18–22; Tr. 499:1.) It proceeded to instruct the jury as follows to ensure that it properly directed its attention in the case to the actual claims at issue, *i.e.,* age and gender discrimination, and also, to provide it with additional context concerning the JUUL agreement, so that it could best parse out the testimony that was relevant to the actual claims at issue:

The Court: . . . I want to give you something called a limiting instruction. . . . Members of the jury, there has been some testimony during the course of this trial regarding the procedure under New York State's Education Law in connection with the consideration of a school teacher for tenure, including testimony regarding something called a JUUL agreement. . . . As you know, the claims in this case are for age discrimination and gender discrimination. There are no claims for fraud, no claim for violation of Education Law procedure, and no claim for breach of a JUUL agreement. The claims here are for age and gender discrimination. However, because there has been testimony regarding the procedure for considering a teacher for tenure and testimony regarding a JUUL agreement, I'm going to explain to you New York law on

these issues so that you can place that testimony in context. . . .

[detailed instruction concerning New York State Education Law, focusing on probationary terms, granting of tenure, and the significance of a JUUL agreement]

Again, this is simply to help you place in context the testimony that you are hearing regarding the procedure and the JUUL agreement.

(Tr. 512:11–12; Tr. 512:18–23; Tr. 512:25–513:9; Tr. 514:3–5.)

During Blangiardo's questioning of Krauza, he again raised the topic of the JUUL agreement. The instant Blangiardo's questions turned away from superficial matters concerning the document itself and to a more fraud-based theme, the Court stopped Blangiardo (following defense counsel's objection) and immediately issued another limiting instruction:

The Court: I just wanted to give an instruction to the jury. I said this to you yesterday, I believe, but again, I sustain the objection to the question about whether this is a material misrepresentation or whether it is dishonest. I just want to give [ ] you an instruction with respect that there are no claims in this case related to fraud or breach of a JUUL agreement. Those are not claims in this case. The claims in this case are age and gender discrimination. That is why I'm sustaining those objections. The jury is not making a determination on whether there was a breach of the JUUL agreement or any type of fraud with respect to the JUUL agreement. Those claims are not in this case and therefore I sustain the objection.

(Tr. 726:18–727:8.) No additional instructions or relief were requested by defendant's counsel with respect to this issue.

In sum, the Court's various warnings to plaintiff's counsel, along with its thorough limiting instructions to the jury, were sufficient to counteract any question that might have been raised in the jury's mind regarding the actual claims at issue and the relevance of Blangiardo's line of questioning as to the JUUL agreement. *Cf. Zafiro v. United States,* 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993) ("[L]ess drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice [to a party]."); *United States v. Potamitis,* 739 F.2d 784, 790 (2d Cir.1984) ("It is sound doctrine, to be sure, that juries must be supposed usually to be able and determined to follow instructions." (alteration omitted)). Thus, no new trial is warranted on these grounds.

ii.   Comments/Line of Question Regarding Videotape of April 16, 2009 Board Meeting

Defendant claims that plaintiff improperly called several witnesses (including Cathy Gilliard, Lisa Hinsch, John Roslak, and Cynthia Pumillo) to testify regarding the existence and whereabouts of a videotape of the April 16, 2009 board meeting. Defendant argues that plaintiff did this in order to make it seem as though the fact that the videotape could not be located illustrates bad faith on the part of the District for allegedly destroying or otherwise tampering with the tape. (*See* Def.'s Mem. at 12–15.)

Defendant's arguments concerning the tape may best be summed up as follows: (1) Blangiardo's line of questioning either implicitly or explicitly suggested to the jury that defendant had wrongfully tampered with the videotape, leading to its now unknown whereabouts (*id.* at 12–14 (citing Tr. 58:8–59:2; Tr. 60:25–61:3; Tr. 104:23–105:9; Tr. 105:10–18)); (2) Blangiardo's manner of questioning (including at times using leading questions), caused him to insert himself as a witness regard-

ing the events of the board meeting, and also enabled him to repeat his statements at the meeting—to the effect that plaintiff's civil rights were being violated—multiple times to the jury (*id.* at 14–15); (3) Blangiardo's questions created the inference that the April 16, 2009 board meeting was, in and of itself, conducted improperly and that defendant took actions to cover up the meeting (*id.* at 15); and (4) during Blangiardo's closing, Blangiardo expressly accused the District of destroying the videotape, thereby casting prejudicially bad lighting upon defendant in front of the jury (*id.* at 15) (citing Tr. 841:3 (stating "he destroyed the videotape); Tr. 841:6 (stating "the videotape they destroyed")).

The Court disagrees with defendant that Blangiardo's line of questioning and comments concerning the videotape were prejudicial to defendant or confusing to the jury, such that a new trial is needed. As a threshold matter, to the extent defendant suggests that the missing video was an improper line of inquiry or argument, that is incorrect. Although the Court denied plaintiff's spoliation motion, the Court made clear that plaintiff's counsel could argue to the jury that the videotape was intentionally discarded so as not to have a video of what, according to the testimony, was a hotly-debated board meeting. The statements that various school officials made at that key meeting regarding plaintiff's employment were clearly highly probative, and thus, a video reflecting those statements also would have been highly probative to show the jury. Thus, plaintiff's counsel was free to argue that the failure to retain that video was intentional by the District, and that some adverse inference against the defendant should be drawn from that fact by the jury. The Court did note to Blangiardo that his repeated focus on the lost video was surprising given that there appeared to be no factual dispute regarding what had transpired at the meeting—in other words, the testimony of each attendee appeared to be materially consistent with each other. For this reason, the Court asked Blangiardo why he continued to inquire about what took place at the meeting, in light of the absence of any corresponding dispute to the meeting's events. (*See* Tr. 171:17–172:23.) [16] However, there was nothing improper about the subject matter or argument. If counsel wanted to focus on the missing video issue for strategic reasons,

16. In particular, the Court inquired of Blangiardo:

> The Court: With respect to this meeting, again we're having witness after witness talk about the tape, where's the tape, and I'm not even clear what the dispute is about what happened at the meeting. Is there any factual dispute about what happened at the meeting? Do they have a different version of what happened at the meeting than your client has?
> Blangiardo: Absolutely than my client has, yes....
>
>     *     *     *
>
> Blangiardo: [T]his problem was started here in the Eastern District in a case that was given to you when I filed this complaint because of their failure and I believe intentional destruction of evidence and I made the motion before the Magistrate and

> took the appeal to you. I asked for a spoliation charge but I believe that at the end of the case I'll be entitled to one and I would like to make that offering at that time.... The Court: I don't want to go back. We did have a spoliation motion and I ruled on that.... I'll give you a chance to make another argument regarding that, but I still haven't heard anything—having multiple witnesses—I haven't heard a single thing where there's a dispute about what happened at that meeting. So far it sounds like everybody is in agreement as to what happened at the meeting.... As far as I can tell so far, everybody agrees on what [the District's counsel] said, on what the board did, and so I'm not sure exactly where this is all heading.
> (Tr. 173:5–13; Tr. 174:11–18; Tr. 175: 2–9; Tr. 175:18–20.)

notwithstanding the absence of any factual dispute about the meeting itself, he was permitted to do so.

The only potential problem with this line of inquiry and argument was that Blangiardo also attended the meeting himself. Thus, as discussed *infra*, the Court wanted to ensure that, through his questioning and arguments, Blangiardo was not going to insert himself as an unsworn witness in the case. (*See* Tr. 172:4–5 (The Court: "... I'm also concerned that you are inserting yourself as a witness in this lawsuit....").) As a result of this warning, the Court avoided any potential "unsworn witness" problem; moreover, there was no point during the trial (either in a jury address or otherwise) in which Blangiardo separately recounted what he recalled as having transpired at the meeting. In any event, there could not possibly be any prejudice to the defendant from this whole line of inquiry because, as noted above, all of the accounts of the witnesses, whom Blangiardo questioned concerning the events that transpired at the meeting, were all consistent, and there was simply no factual dispute in the record between the parties as to what had occurred at the public session of that meeting. Accordingly, the "lost video" issue does not provide any grounds for a new trial.

c.  References to Other Lawsuits

Defendant also argues that Blangiardo improperly tried to insert reference into another lawsuit(s) against the District, which prejudiced defendant. For instance, during Blangiardo's examination of Nine, Blangiardo requested a sidebar. At sidebar, Blangiardo made the following statement in an elevated voice: "At the time of this school board meeting, exactly at that time, Mr. McKenna, the school district and Mr. Venator were codefendants represented by Ms. DeJong in this very courthouse where there were not only civil allegations but criminal allegations." (Tr. 169:2–7.) The Court immediately called for a five minute break for the jury, and then (outside the presence of the jury) strongly cautioned Blangiardo that he needed to keep his voice down at sidebar, especially when making an assertion that there are "criminal allegations." (*See* Tr. 170:5–12.) Blangiardo then described the criminal complaint that, according to him, had been filed by another individual. (Tr. 171:7–16.) Although the Court was concerned that the jury might be able to hear the sidebar, there is no evidence that any jury member heard that allegation and it was never referenced at any other time during the course of the trial. In any event, in an abundance of caution, the Court subsequently asked defense counsel whether she wished to request any relief for what had transpired at sidebar. (Tr. 176:18–24 (The Court: "I did want to ask Ms. DeJong, I don't know if you're requesting any relief with respect to the sidebar. I obviously warned Mr. Blangiardo. Are you requesting any other relief with respect to that? I don't know if the jury heard it or not. Once he started elevating his voice, I asked them to leave. Are you requesting any relief with respect to that?").) Defendant's counsel responded that she was not asking for any relief. (Tr. 176:25–177:2 ("I'm not, Your Honor. I think it would be counterproductive if you ask if they heard anything. I am concerned about Mr. Blangiardo having made himself part of the plaintiff's case and at this point I can't ask for relief but if it continues I certainly will, your Honor.").)

In light of the Court's immediate response to Blangiardo's actions, its firm warning to plaintiff's counsel, and its consultation with defense counsel to confirm whether additional relief was warranted (the latter of which was declined), the Court cannot say that Blangiardo's actions

at sidebar—for which there is no evidence that the jury observed or heard any of it at all—provide sufficient grounds for the granting of a new trial.

Relatedly, during his questioning of Desiderio, Blangiardo explicitly asked the witness whether she previously had been cross-examined by Blangiardo "[a]t trial." Following Blangiardo's examination, the Court reprimanded plaintiff's counsel for taking such action. (*See* Tr. 373:16–22 ("There was no reason to throw that in other than to have the jury speculate oh, there was another trial, was that another trial involving Mr. Claudio? Was the school district sued by somebody else? There was no reason to ask that question. It's not appropriate to throw that out there.").) The Court then asked defense counsel whether she wished for further remedial action to be taken. Defense counsel declined the request, stating, "I think it will defeat the purpose if you call attention to it." (Tr. 374:7–8.) This single reference to an unspecified other "trial" during a question to a witness is not sufficient grounds for a new trial.

### d. Unsworn Witness Issue

Defendant next challenges Blangiardo's attempts to insert himself into the case as an unsworn witness. Defendant highlights the following portions of trial, which it asserts were prejudicial to its case: (1) Blangiardo's statements that, essentially, described himself as being a member of the District and the Mattituck–Cutchogue community (*see* Tr. 39:18 ("[W]e live in a small District on a peninsula....."); Tr. 39:21 ("It's a small community that we live in ..."); Tr. 123:10–11 (stating "before the seven elected board members in our community"); Tr. 125:16–18 (asking "[d]id there come a time when the seven elected board members of our school district board of education ..."); Tr. 811:24–25 ("We live in a, he lives in a small communi-

ty ...")); (2) Blangiardo's references to District school members' first names, rather than by their position or title (*see* Tr. 105:16–17 (referring to the Superintendent and District clerk as "Jim and Cathy"); Tr. 164:9–12 (referring to principal as "Shawn"); Tr. 801:25 (referring to Superintendent as "Jim")); (3) Blangiardo's line of questioning wherein he asked witnesses about whether they recalled Blangiardo's presence at a school board meeting (*see* Tr.:465:2–14; Tr. 738:16–739:2); and (4) Blangiardo's comments regarding the propriety of certain actions taken during the school board's executive session (Tr. 612:12–16 (Blangiardo: Now, you testified that in the executive session there was a vote or a straw poll or a consensus, all three of which I believe are improper but—Ms. DeJong: Objection The Court: Sustained)).

The Court does not find these instances to be so prejudicial as to provide grounds for a new trial. After nearly every instance in which Blangiardo attempted to insert himself as a witness in the case in the aforementioned fashions, the Court admonished Blangiardo against doing so. Regarding Blangiardo's use of the phrase, "our District" and similar turns of phrase, the Court stated:

> The Court: I'm also concerned that you are inserting yourself as a witness in this lawsuit for you to stand up there and repeatedly say our District, our District, didn't I say this, didn't I say that.... [Y]ou cannot insert yourself into this case.

> Blangiardo: I didn't ever want to.

> The Court: You keep saying our District. You're not in this case as a member of the community. You understand that, you're an attorney. You're not supposed to be using the word 'our.'

Blangiardo: I apologize, your Honor.
(Tr. 172:4–7; Tr. 172:22–173:4.)

\*     \*     \*

The Court: ... [F]or a number of hours now I heard you repeatedly say our District, how does it work in our town. That's not acceptable language for an attorney to use in any case, no less a case where there's issues being raised about this meeting and this tape. So I caution you on ... [that] thing[ ], ok?
Mr. Blangiardo: Yes. Thank you your Honor. I apologize for any reference and I will not do it any further.

(Tr. 176:1–9.)

Regarding Blangiardo's comment concerning the propriety of the executive session, the Court stated:

The Court: Mr. Blangiardo, you are again crossing the line despite my numerous warnings. You just testified in front of [the] jury that you believe what the board was doing was improper. That is grossly improper on your part as an attorney to assert yourself as a witness in this case, state what your view is; and secondly, it is in violation of the fact that I told you previously that we were not going to get into this issue with witnesses regarding open meetings and whether or not executive sessions needed to be open or not open. .....
Mr. Blangiardo: Yes, your Honor. And I apologize and I agree with your Honor.

(Tr. 612:23–613:8; Tr. 613:17–18.)

Because counsel had not adhered to the Court's earlier warnings, and because the Court wanted to avoid any potential prejudice to defendant, the Court then informed the parties that it was going to instruct the jury "that attorneys are not permitted to inject themselves and their opinions into the case as if they're witnesses and they should disregard what [Blangiardo] just

did in front of them because it is not something that they need to consider." (Tr. 615:3–8.) The Court also noted that it would flag for the jury that it had warned Blangiardo against taking such actions previously (Tr. 615:9–10), and advised Blangiardo that should he persist in these practices, he risked exposing himself and his client to additional sanctions (Tr. 619:4–24). The Court asked defendant's counsel whether she wanted any other relief beyond the instruction, and she stated that she did not. (*See* Tr. 617:12–22.) This is consistent with the fact that no relief was requested when this had occurred previously. (*See* Tr. 177:3–6 (stating "I am concerned about Mr. Blangiardo having made himself part of the plaintiff's case and at this point I can't ask for relief but if it continues I certainly will, your Honor.").)

Thus, the Court issued an explicit limiting instruction to the jury (with the specific language being agreed to by the defendant's counsel), effectively removing any potential prejudice that might have been caused from the contested incidents described above. (*See* Tr. 621:23–622:21.) In particular, the Court gave the jury the following instruction:

Members of the jury, let me give you an instruction regarding what transpired before the break. Before the break, Mr. Blangiardo told the witness during questioning that he, Mr. Blangiardo, believes that what the board did was improper. An attorney is not permitted to make comments like that during his questioning of a witness. And the attorney is also not permitted to insert himself as a witness in the case. He may only act as an attorney in the case. Therefore, you should disregard Mr. Blangiardo's comments during his questioning of this witness before the break, as well as similar comments that he has made in between

questions of other witnesses during the course of the trial to which I have sustained an objection. I have warned Mr. Blangiardo again that he is not permitted to do that and he has assured me that it will not happen again. I also instruct you that there is no claim in this case regarding the issue of notice to the public of executive sessions, and it is not an issue that the jury should consider in connection with its determination of whether Mr. Claudio has proven the age and gender discrimination claims that are the subject of this case.

(Tr. 621:23–622:21.)

In short, the Court does not find that this conduct, especially in light of the strong instruction to the jury, caused any prejudice to the defendant and is not a ground for a new trial.

### e. Counsel's Physical and Facial Gestures

Defendant asserts that Blangiardo made "extremely expressive facial gestures" and performed various physical acts during trial that illustrated his incredulity or displeasure with certain witnesses' testimony or that reflected negatively upon defendant. (*See* Def.'s Mem. at 18–19.) Put kindly, Blangiardo certainly had a unique courtroom style, and this style did not go unnoticed by the Court. Indeed, on the second day of trial, the Court expressly warned Blangiardo against his pantomiming practices, stating:

The Court: Mr. Blangiardo, this is a courtroom, it's not a show. This is not a Broadway show where you can be up there moving your elbow, putting your hands up in quotes with your fingers. The record does not reflect this but it's ridiculous okay. I'm not going to permit this. This is a Court of law. You're a lawyer. This is not a show. . . . This is not acceptable, okay. I'm warning you again. I'm trying not to make these

types of warnings in front of the jury, but I think the jury even [knows] lawyers know they're not supposed to be doing what you're doing. . . . It's got to stop. Okay. . . . I'm the Judge and there's an integrity to the system and to the rules and everybody has to follow the rules, okay?

(Tr. 271:16–22; Tr. 272:6–12; Tr. 272:20–22.)

Later that same day, the Court again warned Blangiardo against making his overly expressive facial gestures. The Court did so following its exchange with defense counsel, whereupon she stated that she had previously requested a sidebar because of plaintiff's counsel's "histrionics." (Tr. 318:4.) The exchange is as follows:

Ms. DeJong: [Blangiardo] was standing at the podium gesturing in full view of the jury. After your Honor admonished him he's still doing it, so I don't know what to do anymore about it.

The Court: I saw that as well and, again, that was within minutes of me telling you that I didn't want any drama and you still roll your eyes in response to questions or make looks at the jury. And, again, I don't know if other judges permit you to do that, but it doesn't go on in this courtroom and the next time that it happens I'm going to give an instruction to the jury along the lines you've seen [Blangiardo] make various gestures or reactions to various witnesses' testimony. I have warned him that is not proper to do and you should disregard that because an attorney is not permitted to make reactions to witnesses during the course of their testimony. You can't roll your eyes or look at the jury and raise your eyebrows. I've seen it myself as well. That's the next step.

Mr. Blangiardo: I apologize, your Honor. It won't happen again.

(Tr. 318:7–319:3.)

The Court advised Blangiardo against making any such gestures again on the third day of trial. It also instructed plaintiff to speak to Blangiardo regarding his gestures, stating "[Claudio], I suggest you speak to [Blangiardo] about this. He's your agent. You hired him. This is not in your interest to have him do these things and to have me tell the jury, and I'm going to do it, this morning when you made another gesture and I'm going to tell the jury, [Blangiardo] has been warned not to do this and it's inappropriate, you should disregard it." (Tr. 374:9–16.)

The Court also subsequently asked defense counsel whether she wanted a curative instruction given to the jury. (Tr. 374:4–6 ("If you want me to give an instruction on that, Ms. DeJong, I will, but I don't know if you want me to call attention to it or not.").) Her response was: "I think it will defeat the purpose if you call attention to it," and, thus, no further remedial action was taken at that time. (Tr. 374:7–8.)

As the record reflects, the Court took action to remedy Blangiardo's actions, and it did so early into trial (indeed, the first noted warning occurred on the second day of trial). Further, once admonished, Blangiardo generally ceased, or at least made an effort to tone down, his practices. Having observed these antics in the courtroom, the Court is confident that, while clearly unprofessional, they did not prejudice defendant. Indeed, the Court is quite confident that any of the now contested gestures did not have a positively persuasive force over the jury; to the contrary, it is the Court's firm conclusion that Blangiardo's antics weakened his effectiveness in front of the jury due to his less-than-professional-seeming tone and manner.

For these reasons, the Court is not persuaded that plaintiff's counsel's physical and facial gestures provide sufficient grounds for a new trial.

### f. Summation

Defendant contends that, during Blangiardo's summation, he made several forms of improper commentary, including: (1) suggesting that because the District was in a financially superior position to that of plaintiff, compensation for plaintiff is warranted (Def.'s Mem. at 24 (citing Tr. 844)); (2) insinuating that a verdict for plaintiff might result in the termination of Superintendent McKenna (id. at 25 (citing Tr. 846)); (3) referencing facts that were not in evidence (id. (citing Tr. 795; Tr. 797; Tr. 789; Tr. 800; Tr. 805; Tr. 813; Tr. 835; Tr. 843)); (4) incorrectly describing the applicable legal standard (id. at 26 (citing Tr. 837)); (5) inviting the jury to engage in speculation by referencing that Desiderio received tenure the same night as plaintiff's termination (id. (citing Tr. 804)); and (6) stating that he could not ask witnesses about "secrets" or "misrepresentation" "because every time I say that, everything comes down on me," following which statement Blangiardo looked at the Court and defense counsel, and crouched down, as if a force were pressing upon him (Tr. 804:24–25).

To begin with, when "arguing to a jury, counsel must properly have some latitude, so long as prejudice does not appear." *Schwartz v. Nw. Airlines, Inc.*, 275 F.2d 846, 846 (2d Cir.1960). For this reason, "[n]ot every improper or poorly supported remark made in summation irreparably taints the proceedings; only if counsel's conduct created undue prejudice or passion which played upon the sympathy of the jury, should a new trial be granted." *Marcic v. Reinauer Transp. Cos.*, 397 F.3d 120, 127 (2d Cir.2005) (quoting *Matthews*,

871 F.2d at 278) (internal quotation marks omitted). The determination of whether remarks made during summation give rise to a new trial remains in the trial court's broad discretion. *See Malmsteen v. Berdon, LLP,* 595 F.Supp.2d 299, 309 (S.D.N.Y.2009). Moreover, the court making such a determination should consider counsel's summation in its entirety "within the context of the court's rulings on objections, the jury [charge], and any corrective measures applied by the trial court." *Parrish v. Sollecito,* 280 F.Supp.2d 145, 168 (S.D.N.Y.2003) (citation and internal quotation marks omitted). The relevant inquiry in assessing undue prejudice is whether there is a " 'reasonable probability' that the jury's verdict was influenced by the improper conduct of counsel." *Chang v. City of Albany,* 150 F.R.D. 456, 459 (N.D.N.Y.1993) (quoting *Draper v. Airco, Inc.,* 580 F.2d 91, 97 (3d Cir.1978)).

Moreover, "[w]hen the complaining party fails to object at trial to statements made during summation, the court will only grant a new trial when the 'error is so serious and flagrant that it goes to the very integrity of the trial.' " *Hart v. Consol. Rail Corp.,* No. 96 CV 1769(FJS), 1998 WL 865572, at *2 (N.D.N.Y. Dec. 9, 1998) (quoting *Greenway v. Buffalo Hilton Hotel,* 143 F.3d 47, 51 (2d Cir.1998)). Here, defense counsel only objected a handful of times during Blangiardo's main summation, and none of the now contested remarks were those objected to at trial. In fact, defendant's counsel did not object at all during plaintiff's counsel's rebuttal summation, and it was the Court who, after the summations, *sua sponte* raised certain issues regarding counsel's statements, which defendant's counsel then supplemented. (*See* Tr. 849–54.) Although the Court understands that defense counsel might have declined from objecting further for strategic purposes, the absence of a contemporaneous objection requires the Court to find "flagrant abuse" before granting a new trial. *See Wantanabe Realty Corp. v. City of N.Y.,* No. 01 Civ. 10137(LAK), 2003 WL 22862646, at *6 (S.D.N.Y. Dec. 3, 2003); *see also Malmsteen,* 595 F.Supp.2d at 310 (citing cases in which courts have held that a failure to object to summation statements at trial requires a court to grant a new trial only when error is sufficiently flagrant that integrity of trial has been tainted). In any event, even if contemporaneous objections to each of the comments were made, the Court would still conclude that there are no grounds for a new trial based upon Blangiardo's statements.

Here, defendant does not show, nor does the record reflect, that plaintiff's counsel's remarks during summation caused prejudice to defendant. To the extent defendant argues that Blangiardo mischaracterizes the evidence, the Court instructed the jury on more than one occasion (including immediately before the summations) that statements of an attorney in summation are not evidence. (*See, e.g.,* Tr. 789:20–790:2 ("Just a couple of instructions that relate to the summations. I mentioned to you in the beginning of the case, but I mention them to you again. The first thing is that the statements of attorneys in summations, as in the opening statements, are not evidence. They are statements of an attorney. They are arguments about the evidence or the lack of evidence. And the jury is free to accept or reject those arguments.").) Moreover, the Court advised the jury immediately before summations that, if a lawyer argues something that conflicts with the evidence, it is the jury's recollection that controls. (*See* Tr. 790:3–8 ("[I]f an attorney makes reference to evidence that was admitted during the course of the trial and your recollection of the evidence differs from what the attorney says it was, it is obviously the jury's

recollection of the evidence that controls, not what the lawyer says the evidence was.").) Although the Court believes certain of the comments that plaintiff's counsel made during his summation were objectionable, it does not conclude, in its discretion, that his comments or antics prejudiced defendant or affected the integrity of the trial or the verdict in any way for the reasons previously discussed.

However, one of defendant's challenges is of a different nature than those previously addressed in the Court's analysis and deserves more explanation. Defendant argues that plaintiff's counsel improperly referred to the District's financial status, which created the inappropriate inference for the jury that defendant should respond in damages on account of its monetary status.[17] The Court concludes that the comments here were not of such a prejudicial nature regarding the District's financial status such that a new trial is warranted. Blangiardo made a very general (and at times, incoherent) commentary as to the District's monetary status. In comparison to other cases in which courts have found grounds for a new trial based on (among other factors) counsel's comments regarding an opposing party's financial status, counsel's comments are not nearly as explicit or egregious such that the integrity of the trial may be considered to have been compromised. *Cf. Koufakis v. Carvel,* 425 F.2d 892, 902 (2d Cir.1970) (repeatedly referring to defendant as a millionaire and multi-millionaire).

In sum, the vast majority of questionable conduct raised by defendant (and noted by the Court following the summations (*see* Tr. 849–854)), did not touch on the key evidence of the case; rather, it referred to side matters (if they even may be construed as such) that were not relevant to the main issues at hand. Additionally, following summation, the Court charged the jury, during which time it made clear the specific claims before the jury (*i.e.,* age and gender discrimination) (Tr. 869:13–873:1), set forth in detail the particular elements of each claim (Tr. 873:2–875:8), and clearly explained the applicable standard of proof (*id.; see also* Tr. 873:13–18). This charge followed several curative instructions issued during trial (addressed *supra*), which reminded the jury to focus

---

17. Specifically, defendant directs the Court's attention to the following statements:

What's a fellow to do? You work for this corporation that has a budget of over $30 some-odd million each and every year. And it is not a 365 day year. It's a 184 day year. They're chopping up the money in short fashion like about $250,000 a day in a building that Mr. McKenna is in there with his private secretary that now he's made her the clerk, okay?

(Tr. 797:5–11.)

He's a winner already in my book, to have people care about him enough to come to court. Not that you are giving up $35 million dollars every nine months and you get a couple of stragglers come in that aren't on the board anymore because their daughter works for the [D]istrict and coming in with allegiance to do a hatchet job, because that's what happened here.

(Tr. 836:19–25.)

But this is the level of the depravity that we are dealing with here. They will say anything and they will be off to Florida and it won't [ ] matter one penny in their pocket. That's the truth. That's what goes on. And there is not one inch of Long Island that is not covered by one of these school districts.

(Tr. 840:7–12.)

... His wife's getting old. He's getting old. This is what happens when you get old. In insurance we call it red line. We talk, we hear a lot about it in the news and they're trying to do away with that. They're saying you can't treat it as a preexisting condition. That is what they're trying to do. We can't treat it as a preexisting condition.

(Tr. 844:3–10.)

solely on the claims at hand and not to be distracted by plaintiff's counsel's physical gestures or attempts to insert other claims into the case (such as fraud or breach of contract). *See Pappas,* 963 F.2d at 540 ("Some misconduct is *de minimis* in the context of the entire trial, and some is promptly dealt with by the court's rulings and curative instructions."). Certainly, none of the now-contested statements were "so inflammatory or so unsupported by the record as to affect the integrity of the trial," particularly in light of the number of warnings and curative instructions issued throughout the trial. *Marcic,* 397 F.3d at 127. Moreover, defendant's claim to have been prejudiced by the summation is undermined by the fact that it did not object to the statements in question during trial. *See Okraynets v. Metro. Transp. Auth.,* 555 F.Supp.2d 420, 430 (S.D.N.Y.2008) (concluding that defendants did not show "undue prejudice" arising from summation comment where defendant's counsel did not object to the comment when made or move after summation for it to be stricken from the record).

Thus, after careful consideration, the Court declines to order a new trial based on the above-referenced statements because it cannot conclude, on this record, that defendant was deprived of a fair trial in any way. *See Parrish,* 280 F.Supp.2d at 168 ("A new trial is only warranted where the attorney's concluding argument deprived the opposite party of a fair trial." (quoting *Mileski v. Long Island R.R. Co.,* 499 F.2d 1169, 1171 (2d Cir.1974))).

### g. Cumulative Effect

Although not specifically argued by defendant, the Court also considers whether defendant's previous arguments for a new trial may, when considered in the aggregate, be sufficient for purposes of finding such remedy appropriate. *Cf. Floyd v. Meachum,* 907 F.2d 347, 355 (2d Cir.1990) (considering the cumulative effect of a prosecutor's improper statements under the totality of the circumstances and considering whether they affected the "fundamental fairness of the trial"). As the Second Circuit has recognized, the trial court holds a "superior vantage point when evaluating the possible impact of the alleged prejudicial conduct" as "[a] printed record is unable to replicate in full all the circumstances—for example, tones of voices, demeanor of witnesses and jurors and the like—that occur in the course of an unfolding trial." *Pappas,* 963 F.2d at 540 (quoting *Marcoux v. Farm Serv. Supplies, Inc.,* 290 F.Supp.2d 457, 472 (S.D.N.Y.2003)) (internal quotation marks omitted).

Having lived through the trial and observed the full circumstances (including the demeanor of both the lawyers and the jury), the Court believes that the printed record reads in a manner that may suggest that the conduct was more egregious and impactful on the trial than it really was. If the Court concluded that counsel's statements and conduct had adversely impacted the defendant and affected the outcome of the trial, it would not hesitate to order a new trial. However, viewing the contested comments and actions under the totality of the circumstances, "including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case (e.g. whether it is a close case), and the verdict itself," the Court cannot say that a new trial is warranted. *Beyar v. City of N.Y.,* No. 04–CV–3765 (JFB)(KAM), 2007 WL 1959010, at *4 (E.D.N.Y. June 29, 2007). The contested comments and practices primarily concerned collateral or irrelevant issues before the jury, and the jury was reminded of this multiple times at trial during the Court's curative instructions, as well as

following summations during the Court's charging of the jury. The issues were treated by both defense counsel and the Court immediately and in the same manner throughout trial, with either defense counsel objecting or the Court warning Blangiardo and/or issuing a curative instruction to the jury. The Court is not convinced that, absent the inappropriate conduct of plaintiff's counsel, the ultimate outcome of the trial would have been any different. *See Hopson v. Riverbay Corp.*, 190 F.R.D. 114, 122 (S.D.N.Y.1999) ("Conduct that is 'de minimis in the context of the entire trial' or that is appropriately dealt with by curative instructions, is not sufficient to warrant a new trial." (quoting *Pappas*, 963 F.2d at 540)); *cf. Carrier Servs., Inc. v. Omni Mail, Inc.*, No. 98 Civ. 9197(CSH), 2000 WL 1072300, at *4 (S.D.N.Y. Aug. 3, 2000) ("Absent a showing of clear error or manifest injustice, it will generally be appropriate to deny relief pursuant to Rule 59 since litigants should neither be required nor without good cause permitted to relitigate already-decided matters."). Plaintiff's counsel's conduct, as inappropriate at times as it was, did not prevent a fair trial. Particularly given the Court's repeated actions to stop such misconduct, admonish counsel, and provide curative instructions to the jury, counsel's behavior here cannot be said to have "infect[ed the] trial with undue prejudice or passion as to require reversal." *Reilly v. Natwest Mkts. Grp., Inc.*, 181 F.3d 253, 271 (2d Cir.1999) (internal quotation marks omitted).

The Court also notes that it has examined other cases where a new trial has been granted on account of trial counsel's misconduct. On careful consideration of these cases, the Court does not find that the circumstances of this case are of such an egregious nature that they may be deemed to be of the same level. *See, e.g., Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 206–11 (3d Cir.1992) (concluding that a new trial was necessary in light of trial counsel's inflammatory remarks during summation, including improperly referring to his own truthfulness, improperly commenting on what he perceived to be the justness of his case, inserting "facts" not in evidence about defendant's witnesses, explicitly accusing defendant's witnesses of being "liars" and "perjurers," making repeated inappropriate references to the defendants' wealth, and issuing a derogatory, insulting attack upon defense counsel throughout the summation, including by suggesting that defense counsel had made misrepresentations to the jury, and also, because the court's subsequently issued curative instruction was not sufficient to remove the taint of prejudice); *Koufakis*, 425 F.2d at 900–04 (new trial appropriate where trial counsel made repeated references to defendant as a member of the mafia, with no warning or curative instruction(s) given, repeatedly emphasized defendant's superior financial status, frequently commented during summation on defendant's failure to testify and referred to him on multiple occasions as a "liar," "faker," "phony," and "perjurious," referenced numerous other lawsuits against defendant, misused the findings of the Federal Trade Commission's trial examiner, and made improper references to himself and to opposing counsel, all with little to no reprimands or curative instructions issued on the part of the Court, and with an excessively large jury verdict issued); *Hopson*, 190 F.R.D. at 122–23 (new trial warranted where trial counsel (1) improperly alleged that plaintiff had given a false alibi, had lied in Bronx Criminal Court, and was the subject of more than two charges at the Department of Corrections disciplinary proceedings; (2) misstated alcohol impairment law; (3) made misleading state-

ments; and (4) misrepresented that counsel did not have the authority to settle).

In sum, having observed the witnesses, jury, and counsel throughout the course of this case, and having considered the Court's various warnings, curative instructions, and consultations with defense counsel to confirm if she wanted further relief, the Court concludes that defendant was not deprived of a fair trial. For these reasons, the Court denies defendant's Rule 59 motion for a new trial in its entirety.

### D. Appropriate Relief

#### 1. Back Pay Damages

Defendant argues that the jury's award of $70,000 in back pay and one dollar in nominal damages is not supported by the record, but rather, is based on plaintiff's counsel's statements during his summation. (Def.'s Mem. at 26–27.) Further, defendant contends that if the jury had followed the Court's charge, it could not have arrived at such a sum, except by conjecture. (*Id.*)

Specifically, defendant argues that evidence in the record established that plaintiff's 2008 W–2, reflecting income from his last year with the District, stated the sum of plaintiff's wages and tips as $58,000. (*Id.* at 26 (citing Tr. 559).) Following plaintiff's termination from the District, evidence showed that plaintiff earned $23,980 in 2010 and $44,466 in 2011—in both instances, working as a manager at his family restaurant. (*Id.* (citing Tr. 560–61).) Defendant additionally asserts that plaintiff took few steps to mitigate his damages. In particular, defendant claims that evidence shows that plaintiff was unsure as to which school districts he applied to in 2008–2009 (*id.* (citing Tr. 674)), and that, other than through the online system, plaintiff did not submit any applications in 2009–2010 or look through any advertisements to confirm school position vacancies

(*id.* (citing Tr. 674)). Defendant notes that, during plaintiff's counsel's closing argument, counsel expressly asked the jury to award plaintiff $70,000 in back pay on the grounds that, as a special education teacher, plaintiff would have received approximately $22,000 a year for the three years following his termination if he had not been terminated. (*See* Tr. 812:13–22; Tr. 846:17–21.) This was the exact amount that the jury awarded, which defendant contends was improper and based solely on plaintiff's counsel's summation statements.

■ The Court rejects defendant's arguments. The jury's verdict here is adequately supported by evidence in the record for the following reasons.

Generally, back pay should be calculated according to what the person would have earned were it not for discrimination. *See Kirsch v. Fleet St., Ltd.,* 148 F.3d 149, 166 (2d Cir.1998) (stating that the purpose of back pay is "to restore the employee to the status quo he would have enjoyed if the discriminatory discharge had not taken place" (citation and internal quotation marks omitted)); *Greenbaum v. Handelsbanken,* 67 F.Supp.2d 228, 270 (S.D.N.Y. 1999) (finding back pay award to be a reasonable calculation of income plaintiff would have received had she not faced any sex discrimination); *see also Banks v. Travelers Cos.,* 180 F.3d 358, 364 (2d Cir. 1999) (holding back pay as an award that should begin to be calculated at the time of discharge from employment); *Bergerson v. N.Y. State Office of Mental Health,* 853 F.Supp.2d 238, 243 (N.D.N.Y.2012) ("An award of back pay should be based on what the plaintiff would have earned had she not been terminated."). Thus, the jury was required to calculate what plaintiff would have earned had he not been discharged for (as the jury found) discriminatory reasons. Typically, "[a]n award of

back pay [ ] spans from the date of plaintiff's discriminatory termination to the date of judgment and includes 'lost salary, including anticipated raises, and fringe benefits.'" *Bergerson*, 853 F.Supp.2d at 243 (quoting *Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 144–45 (2d Cir.1993)). Thus, in calculating back pay, the jury here had to consider what plaintiff would have earned from the time of his termination in 2009 until the date of judgment, which occurred on October 22, 2012, had he retained his position as a special education teacher.

Plaintiff's testimony established that, prior to becoming a special education teacher, plaintiff—then employed as a teacher's assistant (*see* Tr. 650:1–22)—earned $22,705. (*See* Tr. 680:15–25.) When plaintiff first became a special education teacher in 2005–2006, however, he received a salary of $46,484. (Tr. 682:1–15.)[18] Plaintiff's testimony also established that on plaintiff's 2008 tax return, which reflected income from his final year with the District, plaintiff's total wages and tips were listed as $58,000. (Tr. 558–559.) Thus, from the evidence in the record, it seems clear that a full time special education teacher employed at the District at a step one level would be making, at the very least, a salary in the ballpark of $46,484. (*See* Tr. 682:1–15.)

As previously set forth, the relevant back pay period includes from the time of plaintiff's termination (2009) until the date of judgment (October 22, 2012). Thus, this will include an approximate three-plus year school period. Even assuming that plaintiff would have received the same salary during those years (*i.e.*, that plaintiff would not have increased in step), and factoring in plaintiff's income from other sources in 2010 and 2011 ($23,980 and $44,466, respectively), the jury's verdict here is reasonable. Had the jury calculated his back pay based on a step one, full-time special education teacher, plaintiff's wages would have well-exceeded $100,-000—namely, about $139,000.[19] If they factored in his income from other sources, his income would have been approximately $70,000, if not slightly more, for that period.[20] For these reasons, the Court concludes that the jury's verdict is supported by the record and is not unreasonable.

■■■■ The Court agrees with defendant, however, that the jury's award of nominal damages here was inappropriate. Generally, "[t]he traditional award of one dollar is the remedy in a case in which compensatory relief is available in principle, but [where] plaintiff did not establish the amount of injury and so cannot obtain a substantial award." *McLaughlin v. New York, Governor's Office of Emp. Relations*, 784 F.Supp. 961, 979 (N.D.N.Y.1992); *see also id.* ("Nominal damages are *de minimis* compensatory damages, available only to a plaintiff who has proven liability and is entitled to compensatory relief, but has not proven that a larger award of damages is warranted in that particular case."). Here, the Court instructed the jury that if it returned a verdict in plaintiff's favor on either claim, but concluded that plaintiff failed to establish that he suffered any actual injuries, then it must award nominal damages to plaintiff. (Tr.

---

**18.** Defense counsel similarly noted this distinction in salaries for a teacher's assistant versus a full-time special education teacher in her summation, acknowledging that a teacher's assistant earned approximately "22,000–something." (Tr. 831:9–12.)

**19.** By the Court's calculations, $46,484 × 3 = $139,452.

**20.** That is, $46,484 for one year, $22,504 for 2010 ($46,484–$23,980), and $2,018 for 2011 (46,484–$44,466), which comes to a total of $71,006.

882:17–24.) The jury's verdict, however, reflects that it did, in fact, conclude that plaintiff suffered a compensable injury in the amount of $70,000 arising from plaintiff's wrongful termination. For this reason, the Court holds that the jury's award of nominal damages here was improper and vacates it accordingly.

Because the back pay award here, in light of the evidence in the record, is reasonable and cannot be viewed as punitive, the Court finds no reason to alter the award or to grant a new trial on the issue of damages. However, the Court vacates plaintiff's award of nominal damages, as this award conflicts with the jury's award of back pay damages.

### 2. Front Pay, Lost Benefits, Reinstatement, and Attorneys' Fees

Plaintiff cross-moves for reinstatement of his position at the District, or alternatively, for front pay and lost benefits, and also, for attorneys' fees and costs pursuant to Fed.R.Civ.P. 54(d)(2). (Pl.'s Mem. of Law in Opp'n to Def.'s Rule 50 & 59 Mot. and in Supp. of Pl.'s Mot. for Reinstatement, Attorney's Fees & Costs ("Pl.'s Opp'n Mot.") at 20–25.)

▌ Generally, "front pay" has been understood by courts as "money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement." *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846, 121 S.Ct. 1946, 150 L.Ed.2d 62 (2001). Thus, if "an appropriate position for the plaintiff is not immediately available ...," courts have ordered reinstatement upon the opening of such a position and have ordered front pay to be paid until reinstatement occurs." *Id.* Where reinstatement is not a viable option, whether due to continuing tensions between plaintiff and the employer or to other reasons, "courts have ordered front pay as a substitute for reinstatement." *Id.*

Here, it is not clear from the parties' submissions whether an appropriate position for plaintiff is available. Defendant's brief simply focuses on whether another *special education* teaching position is available, but it does not address whether other teaching positions in the District, for which plaintiff might be suitably qualified, are available. The Court requires additional proof regarding the issue of reinstatement in order to determine which form of relief (*i.e.,* reinstatement versus front pay/benefits) is most appropriate.[21] Accordingly, the Court will schedule a conference with counsel to address the outstanding issues of reinstatement, front pay, and benefits. The parties shall submit supplemental briefing on these issues.

▌ The Court holds similarly as to plaintiff's motion for attorneys' fees. The Court finds plaintiff's submissions to be inadequate for purposes of assessing, at the very least, the nature and hours of work actually expended in this litigation. Generally, to calculate a reasonable fee, courts must calculate a "lodestar figure," which is determined by multiplying the number of hours reasonably expended on a case by a reasonable hourly rate. *See Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *see also Luciano v. Olsten Corp.,* 109 F.3d 111, 115 (2d Cir.1997). Relatedly, "[t]he 'lodestar' figure should be in line with those rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Luciano,* 109 F.3d at 115 (alteration, citation, and internal quotation marks omit-

---

**21.** Although defendant submitted supplemental information after oral argument, the Court believes that additional information is required.

ted). Additionally, a party's attorney's claim for fees must be adequately supported by time records, detailing "for each attorney, the date, the hours expended, and the nature of the work done." *See N.Y. Ass'n for Retarded Children v. Carey*, 711 F.2d 1136, 1148 (2d Cir.1983). "Failure to support a fee application with [such] records generally results in denial of any award." *Kingvision Pay–Per–View, Ltd. v. Body Shop*, No. 00 Civ. 1089(LTS)(KNF), 2002 WL 393091, at *5 (S.D.N.Y. Mar. 13, 2002) (quoting *Kingvision Pay–Per–View v. Jasper Grocery*, 152 F.Supp.2d 438, 443 (S.D.N.Y.2001)). The Court has discretion to determine whether a requested fee award shall be granted. *See Luca v. Cnty. of Nassau*, 698 F.Supp.2d 296, 306 (E.D.N.Y.2010).

■■■ Here, plaintiff's submitted documentation in support of his motion for attorneys' fees is insufficient for purposes of allowing the Court to reasonably assess the requested fees. Plaintiff's materials do not clearly set forth the nature of the work conducted, how the fees were accumulated, or the reasonableness of plaintiff's counsel's billing rate in light of the work done and the applicable rates for lawyers of similar skill, reputation, and experience. *See Cablevision Sys. N.Y.C. Corp. v. Diaz*, No. 01 Civ. 4340(GEL)(FM), 2002 WL 31045855, at *5 (S.D.N.Y. July 10, 2002) (denying motion for attorneys' fees where plaintiff's requested legal fees were based on a flat rate for certain work, without specifying the number of hours spent on the work); *see also Body Shop*, 2002 WL 393091, at *5 (denying request for attorneys' fees where application did not include supporting documentation clarifying how the fees were accumulated). For these reasons, the Court will allow plaintiff's counsel an opportunity to supplement his submissions to provide further support for his application for attorneys' fees.

### III. Conclusion

For the reasons stated herein, defendant's Rule 50 motion for judgment as a matter of law and Rule 59 motion for a new trial are denied in their entirety. As set forth in the Court's oral ruling prior to trial and herein, summary judgment was granted in defendant's favor on all remaining claims, other than the gender and age discrimination claims. The Court upholds the jury's compensatory award of damages, but vacates its award of nominal damages. The parties shall submit supplemental briefing on the issues of reinstatement, front pay, and lost benefits. Additionally, plaintiff shall submit supplemental documentation in support of his motion for attorneys' fees.

SO ORDERED.